# United States Court of Appeals

## For the First Circuit

No. 06-2507

GREGORY DRAKE,

Petitioner, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

ON APPEAL FROM A DECISION OF THE UNITED STATES TAX COURT

Before

Boudin, <u>Chief Judge</u>,

Torruella, <u>Circuit Judge</u>,

and Schwarzer,[*] <u>Senior District Judge</u>.

<u>Timothy J. Burke</u> with whom <u>Burke & Associates</u> was on brief for petitioner, appellant.
<u>Rachel I. Wollitzer</u>, Tax Division, Department of Justice, with whom <u>Eileen J. O'Connor</u>, Assistant Attorney General, and <u>Kenneth L. Greene</u>, Tax Division, Department of Justice, were on brief for respondent, appellee.

December 20, 2007

---

[*]Of the Northern District of California, sitting by designation.

**BOUDIN, <u>Chief Judge</u>**.  Gregory Drake's decade-long battle with the IRS is recounted in rich detail in the Tax Court's decision.  <u>Drake</u> v. <u>Comm'r</u>, 92 T.C.M. (CCH) 37 (2006) ("Drake II").  The present phase began when the IRS Appeals Office on November 10, 2003, upheld an IRS proposed tax levy.  On appeal, the Tax Court remanded, finding that Drake's initial hearing was tainted by improper ex parte communications between an IRS insolvency unit advisor and the settlement officer handling Drake's case.  <u>Drake</u> v. <u>Comm'r</u>, 125 T.C. 201, 210 (2005) ("Drake I").

A second hearing occurred before a new IRS appeals officer on November 4, 2005.  At that time Timothy Burke, Drake's counsel, and two IRS agents discussed settlement, and Drake submitted a compromise offer on November 14.  Drake then filed a motion for his attorney's fees incurred in relation to the first hearing.  In the same month, the IRS imposed a jeopardy levy--which it may do subject to a hearing "within a reasonable period of time after the levy"--on the proceeds of a 1997 bankruptcy sale of Drake's house, comprising around $150,000 held in brokerage accounts in the names of Drake's sons.  26 U.S.C. § 6330(f) (2000).

Throughout December 2005, the parties continued settlement discussions.  By letter on December 20, 2005, the IRS made a detailed global settlement offer, seeking to resolve all outstanding issues involving Drake, his wife Barbara, and his two sons; the sons' involvement turned on their control of the sale-of-

-2-

house proceeds.  Drake was given until December 28 to accept the offer, and when he failed to do so, the IRS informed him that the offer was no longer available.

Nevertheless, Burke had a conference call with IRS counsel on January 6, 2006, after which the IRS sent Burke a set of settlement documents with a letter stating:

> Pursuant to our conversation of this date, we are enclosing the original and two copies of a Decision document in the above-referenced case.  The original and one copy should be signed, dated, and returned to this office for filing with the Tax Court.

The documents were to be signed by Burke and Drake's sons.[1] Neither Burke nor Drake's sons signed and returned the settlement documents.

On January 13, 2006, the IRS sent a letter to Burke stating that "[a]s of this date, the terms of the settlement have not been accepted by your client and related parties. . . .  We are hereby withdrawing the proposed January 6, 2006 settlement . . . ." Burke responded, taking the position that the parties had agreed to settle "on the terms reflected in the December 20, 2005 letter. . . . .  It is the taxpayers' position that the Service breached the

---

[1]The documents were waivers on behalf of Drake's sons, to be executed by Burke; memoranda from Drake's sons to Citigroup instructing Citigroup to transfer the assets in their brokerage accounts to the IRS; and a stipulation to be filed with the Tax Court indicating that the dispute would be resolved according to the terms of the IRS's December 20 letter.

parties agreement on January 13, 2006 by way of its letter of that date."

The IRS also considered Burke's proposal as an offer-in-compromise. Burke's proposal included the same terms as the January 6 settlement offer except that he reserved the right to seek attorney's fees. In a March 13, 2006, notice of determination, the IRS rejected that offer while upholding the jeopardy levy and the IRS's collection action.

Drake challenged the second notice of determination, and on July 24, 2006, the Tax Court issued a new decision which is now before us on appeal. It found no procedural defects in Drake's second collection hearing and no final settlement between the parties barring the IRS from its full assessment; it also ruled that the IRS had not abused its discretion in imposing a jeopardy levy and in rejecting Drake's offer-in-compromise, and that Drake was not entitled to attorney's fees. Drake now appeals.

Our review of the Tax Court's decision is in most respects similar to our review of district court decisions: factual findings for clear error and legal rulings de novo. Interex, Inc. v. Comm'r, 321 F.3d 55, 58 (1st Cir. 2003); Kinan v. Cohen, 268 F.3d 27, 32 (1st Cir. 2001). As to the IRS's rejection of Drake's offer-in-compromise and its imposition of the jeopardy levy, review turns on whether the IRS abused its discretion. Murphy v. Comm'r,

469 F.3d 27, 32 (1st Cir. 2006); Olsen v. United States, 414 F.3d 144, 150 (1st Cir. 2005).

Drake's most promising argument is his claim to have reached a binding settlement agreement with the IRS on January 6, 2006. Drake claims that his attorney asked the IRS attorney whether the December 20 offer was still open, the IRS attorney said yes, and Drake's attorney accepted the offer, thereby binding the IRS. Curiously, this specific narrative is contained in Drake's brief but not in Burke's terse affidavit, which merely describes the fact and length of the conversation.[2]

Without filing any affidavits, the IRS said that the offer was the January 6 letter sent to Burke, and that Burke's failure to return the settlement documents, or otherwise respond to the letter, constituted a failure to accept the offer which was then withdrawn. The Tax Court assumed only that Burke had on January 6 told the IRS counsel that Drake and his wife wanted to go forward with the settlement on the terms earlier proposed and that the IRS then sent on the documents. As neither side seeks an

---

[2]The narrative was not even contained in Drake's motion to compel settlement before the Tax Court. In that motion--to which no affidavit was attached--Drake claimed only that during the January 6 conference call Burke told the IRS that its settlement offer "had been accepted" by the Drakes. The Tax Court understandably concluded that Burke's purported acceptance of the settlement offer was ineffective, as the earlier offer had lapsed. Drake put forth the more detailed narrative only later in his motion to vacate the Tax Court's decision, claiming that the IRS renewed its settlement offer during the January 6 phone call, and Burke accepted that offer.

evidentiary hearing, we accept the Tax Court's version of the events.

Was there, then, on this record a binding contract established as of January 6? Under classic contract principles, the parties might have intended that a binding agreement be formed immediately--in which event the IRS would now be bound unless the Drakes' failure promptly to sign the documents forfeited their rights. Or the parties could have intended an agreement only after the terms were reduced to writing and the documents signed-- leaving the IRS (or the Drakes) free to back away.[3]

There are other possibilities as well. The parties might have had different understandings or they may not have thought specifically about what would happen if either side changed its mind before the contract was signed. In all events, where the matter is uncertain and no further evidence is furnished as to what the parties had in mind, courts tend to attribute to the parties whatever common intention seems most consonant with the objective facts, looking to "context, inferred purpose and common sense . .

---

[3]See 1 Richard A. Lord, Williston on Contracts § 4:11 (4th ed. 2007) ("[I]t is possible and frequently occurs that the parties will contemplate reducing their agreement to writing before it will be considered complete, in which case there is no contract until the writing is executed."); Restatement (Second) of Contracts § 27 & cmt. b (1981); see also Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320, 322 (2d Cir. 1997) ("[P]arties are free to bind themselves orally . . . . However, if the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then.").

. in determining what the parties probably intended or would have been likely to intend if they had focused on the issue." OneBeacon Ins. Co. v. Georgia-Pacific Corp., 474 F.3d 6, 8 (1st Cir. 2007); accord Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985).

The Tax Court's conclusion that there was no binding agreement on January 6 is entitled to deference unless clearly erroneous. See Salem Laundry Co. v. New Eng. Teamsters & Trucking Indus., 829 F.2d 278, 280 (1st Cir. 1987). The most telling piece of objective evidence, which supports the Tax Court, lies in status reports filed with the court on January 6. The IRS report said that the parties were still negotiating but "[a]s of this date. . . have not resolved the outstanding income tax liabilities . . . ." Burke's report had a more optimistic tone, but did not claim a definitive agreement.[4]

Drake now conjectures that the IRS filing was prepared prior to January 6 and not revised to reflect the January 6 conversation between counsel; but the January 6 telephone conference was held at 9:56 a.m. and there is no indication that the IRS filing was made prior the call. The IRS lawyer, filing a

---

[4]Drake's January 6 status report states that "counsel have undertaken extensive negotiations to resolve the subject matter and believe that they have achieved a basis for settlement"; that "a revised Offer in Compromise is . . . to be forwarded for a determination of processability"; and that "[i]t is expected that this matter will be resolved within thirty days."

report before the present disagreement arose and characterizing the status of the matter "as of this date," certainly had no reason to mis-describe the state of play.

Drake says that the phrase used in his counsel's status report--that the parties "believe they have achieved a basis for settlement"--means a definitive agreement. But while the phrase can be used in this way, Lewis v. Comm'r, 90 T.C. 1044, 1046 (1988), it can as a matter of language just as easily mean that the definitive agreement will be the written one. And it is not a phrase used in this case by the IRS's status report.

Further, while a complex deal can be reached in an oral conversation, here the global settlement had terms affecting several different parties, and needed papers to be signed by non-parties--i.e., the Drakes' two sons--and delivered to non-parties, namely Citigroup. It would not be surprising to require the execution and return of the enclosed documents as the final steps needed to complete the contract.

Indeed, the IRS argues that because the global settlement involved members of the Drake family who were not party to the Tax Court proceedings, the agreement actually had to be in writing, see 26 U.S.C. § 7122; 26 C.F.R. § 301.7122-1(d)(1). Whether these provisions apply under these circumstances may be debatable, Haiduk v. Comm'r, 60 T.C.M. (CCH) 864 (1990), but either way it makes some

sense to treat the IRS's request for signed documents as a precondition to settlement.

Without explanation, Drake failed to return the documents or otherwise communicate with the IRS for a week before the IRS revoked the offer. And although Burke continued to insist in correspondence that an agreement had been reached, Drake waited until February 22 to inform the Tax Court of the settlement, and another six weeks before filing a motion to compel settlement. While none of these facts is dispositive, they tend to confirm that the Tax Court did not clearly err in finding no contract.

This brings us to Drake's quite separate argument resting on additional facts. Section 7122 allows the IRS to "compromise any civil case arising under the internal revenue laws," and accompanying regulations provide guidance regarding the grounds for compromise and the procedures for submission and consideration of offers. 26 U.S.C. § 7122; 26 C.F.R. § 301.7122-1. Drake asserts that the IRS abused its discretion in refusing to accept an amended offer-in-compromise reflecting the terms of the December 20 proposal.

Drake initially submitted an offer-in-compromise on November 14, 2005, proposing to return $75,000--half of the money in the brokerage accounts. However, Drake failed to submit certain financial documents that the IRS had requested in the November 4, 2005, hearing, and the IRS postponed any processing of the offer-

in-compromise.  Drake did not thereafter submit the requested financial information.

After the abortive settlement efforts ended with the withdrawal of the IRS's January 6 proposal, the IRS informed Drake by letter on January 19, 2006, that his offer-in-compromise would be submitted for processing.  Thereafter on January 28, 2006, Drake sent a letter to the IRS amending his offer to reflect the terms of the December 20, 2005, IRS proposal, modified to reflect Drake's reservation of the right to seek attorney's fees.  On March 13, 2006, the IRS issued a new notice of determination which inter alia rejected Drake's offer-in-compromise.

In its March 13, 2006, letter, the IRS cited again the failure to provide the requested financial information.  Drake says that the intervening settlement negotiations obviated that earlier request and that the IRS in a letter on January 19 stated that it would notify Drake if any further financial information was required.  The former argument is weak; the latter more helpful to Drake.

But even if there were some uncertainty as to whether the IRS still wanted the financial information, it was certainly resolved by the March 13 letter.  There is no indication that Drake sought to supply it and asked the IRS to revisit the matter based on Drake's asserted misunderstanding that the information was still required.  This is a sufficient basis to uphold the rejection of

his offer.  Nor would it be easy, in any event, to compel the IRS to accept an offer it deemed inadequate.

Drake also challenges the IRS's November 22, 2005, jeopardy levy, imposed upon the proceeds of a 1997 bankruptcy sale which were given by Drake to his sons and thereafter held in brokerage accounts in the sons' names.  The IRS may impose a pre-hearing levy where collection of the tax is jeopardized by a taxpayer's removing an asset from the United States, concealing it, dissipating it, or transferring it to other persons.  26 U.S.C. § 6330(f); 26 C.F.R. §§ 1.6851-1(a)(ii); 301.6861-1(a).

Drake argues that there was no attempt to conceal or dissipate the assets; but the transfer is itself sufficient, given Drake's conduct.  On January 24, 2002, he responded "no" to the question whether he had transferred assets out of his name for less than actual value.  In his initial collection due process hearing, Drake failed to provide information requested by the IRS Appeals Officer relating to the whereabouts of the 1997 bankruptcy sale proceeds.

It was not until early 2005, during testimony in Barbara Drake's bankruptcy proceedings, that Drake disclosed the whereabouts of the 1997 bankruptcy sale proceeds, and the IRS learned that the $150,000 was being held in the sons' names.  The IRS was entitled to find in November 2005 that there was a risk that Drake was attempting to conceal or dissipate assets by

-11-

transferring them to his sons and by failing on numerous occasions to disclose that transfer to the IRS. The IRS did not abuse its discretion in reaching this conclusion.

Drake next argues, in rather cursory fashion, that his second hearing before the IRS, held after the Tax Court remand, was tainted by "unlawful activities." To the extent that Drake contends that the second hearing "of its own accord, has raised substantial issues," that argument is waived as Drake failed to specify what "issues" were raised by the second hearing. See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998).

Alternatively, if Drake is arguing that the improper ex parte communications that infected the first hearing also rendered the second hearing invalid, his contention is easily rejected. On remand from the Tax Court, Drake received a new hearing before a new appeals officer who had received no improper communications. Nothing suggests that the error that infected the first hearing was not fully cured by the second hearing.

Finally, Drake requests attorney's fees incurred as a result of the first failed IRS hearing. In tax-related administrative or court proceedings "the prevailing party may be awarded a judgment or a settlement for . . . reasonable litigation costs," which includes reasonable attorney's fees. 26 U.S.C. § 7430(a)(2), (c)(1)(B)(iii). Section 7430 defines a prevailing

party as one who has "substantially prevailed with respect to the amount in controversy, or has substantially prevailed with respect to the most significant issue or set of issues presented." Id. § 7430(c)(4)(A)(i)(I), (II); 26 C.F.R. § 301.7430-5(a)(2).

The question is whether Drake can be characterized as a "prevailing party"--despite his defeat in Drake II--because he secured a remand from the Tax Court in Drake I and then lost in the remanded proceeding. Although this court has not previously addressed this issue, the circuits that have all agree that a prevailing party must prevail in the final outcome of the case.[5] Drake ultimately lost on all of his claims and is not entitled to attorney's fees.

Affirmed.

---

[5]Wilkerson v. United States, 67 F.3d 112, 120 (5th Cir. 1995); Cassuto v. Comm'r, 936 F.2d 736, 741 (2d Cir. 1991); see also Swietlowich v. Bucks County, 620 F.2d 33, 34 (3d Cir. 1980) (similar outcome in civil rights case).