131 T.C. No. 16


UNITED STATES TAX COURT


DAVID W. TROUT, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5690-05L.                    Filed December 16, 2008.


In 1997, P entered into an offer-in-compromise (OIC) covering tax years 1989, 1990, 1991, and 1993.  The OIC included a term requiring P to timely file and pay his taxes for five years.  P filed his 1996 tax return late, then failed to file 1998 and 1999 returns.  P filed his 1998 taxes, showing a refund due, in November 2003, but failed to sign his 1999 return, which showed a liability of $164.  In March 2004, R sent P a notice of intent to levy and P requested a CDP hearing.  P paid his liability for 1999 but still failed to file a signed return.  R issued a notice of determination upholding the collection action in March 2005.  P claims failure to file the 1999 return was not a material breach, relying on <u>Robinette v. Commissioner</u>, 123 T.C. 85 (2004).  P claims that R abused his discretion (1) in finding that P had not timely filed his 1998 and 1999 returns and (2) in refusing to reinstate the OIC because the breach of the OIC's obligation to timely file was not material.  <u>Held</u>, P did not gain the benefit of the exceptions listed in sec. 7502, I.R.C., to the general rule that a tax return is filed when received.  Under Rule 122, the Court could not make a finding on P's credibility and overwhelming evidence indicated that R did not receive either

return on time.  Therefore, R's finding that 1998 and 1999 tax returns were not timely filed was not an abuse of discretion. <u>Held</u>, <u>further</u>, applying general principles of the federal common law of contracts, P's OIC agreement made timely filing and payment of tax express conditions.  P was not powerless to avoid the breach, and the failure to reinstate his OIC caused no forfeiture, so R did not abuse his discretion in finding P had breached the OIC and determining to proceed with collection.

<u>Robert E. McKenzie</u> and <u>Kathleen M. Lach</u>, for petitioner.

<u>Thomas D. Yang</u>, for respondent.

OPINION

HOLMES, <u>Judge</u>:  David Trout offered the IRS $6,000 to settle his 1989, 1990, 1991, and 1993 tax bills which totaled $128,736.45.  The Commissioner accepted this offer in 1997.  As part of the deal, Trout agreed to file his tax returns, and pay any tax due, on time for the next five years.  The Commissioner says that Trout broke that deal, and now wants to collect the original bill.  Trout says that he did file his returns on time but that, even if he didn't, his failure was too immaterial to be a breach of his contract with the IRS.  And even if it was a breach, he argues that his default did not justify reinstating his original tax bill.

In <u>Robinette v. Commissioner</u>, 123 T.C. 85 (2004), we faced a very similar question and in our lead opinion looked at least in part to the state law of Arkansas to resolve it.  <u>Id.</u> at 109. The Eighth Circuit carefully noted that "it is not clear that the

Tax Court applied or relied upon Arkansas law.  To the extent
that Arkansas law might differ from the contract principles that
derive from federal common law, * * * federal law governs this
case."  Robinette v. Commissioner, 439 F.3d 455, 462 n.6 (8th
Cir. 2006).  Today, we revisit the issue and state more plainly
that the federal common law of contracts applies.  Using that
law, we conclude that Trout breached his contract with the
Commissioner, and we hold that the Commissioner did not abuse his
discretion in refusing to reinstate the original deal.

Background

Before offering to compromise his tax debt, Trout had not
always filed on time.  In the years before he signed the deal in
January 1997, he was late more often than not:

| Year | Due | Received |
|------|------|----------|
| 1989 | 4/15/90 | 6/13/91 |
| 1990 | 4/15/91 | 4/15/91 |
| 1991 | 4/15/92 | 4/15/92 |
| 1992 | 4/26/93 | 8/15/93 |
| 1993 | 10/15/94 | 3/25/96 |
| 1994 | 10/15/95 | 4/9/96 |
| 1995 | 8/15/96 | 11/7/96 |

Settling with the IRS in the form he did--called an offer-in-
compromise (OIC)--gave Trout a chance for a fresh start with the
tax system.  But there was a catch--the OIC provided that he had
to satisfy "all of the terms and conditions of the offer" or the

Commissioner could reinstate his original tax liability. One of these terms was that Trout had to both file his returns on time, and pay the tax due, for five years after signing the OIC.

Trout, however, flopped back to his old ways within a year, by not filing his 1996 tax return until April 1998. The Commissioner either wanted to give Trout another chance or didn't notice, because the OIC wasn't defaulted. Trout filed and paid his 1997 taxes on time, but then fell back into trouble for 1998 and 1999. His 1998 return was due (with extensions) in October 1999. His 1999 tax return was due (again with an extension) in August 2000. The IRS says it never received either one, and the Commissioner finally noticed and sent "potential OIC default letters" to Trout and his lawyer in September 2001.[1] These letters gave him 30 days to file and pay any taxes that he owed for 1999, and threatened him with termination of the OIC and the reinstatement of any of his original tax liabilities remaining unpaid if he didn't.

After hearing nothing for almost seven months, the Commissioner sent Trout an "OIC default letter" on April 15, 2002. He sent this letter to Trout's address in Phoenix, Arizona--the same address to which he sent the "potential OIC default letter" and the address which both parties agree was

---

[1] In fairness to Trout, we do note that he then had a run of timely filed and paid returns for tax years 2000-02.

- 5 -

Trout's residence during the 2001 and 2002 tax years. Another year passed, and in May 2003 the Commissioner sent a "Notice of Intent to Levy" (NIL) to Trout--and sent it not to Phoenix, but to a concededly wrong address.

Trout never responded to the NIL that the Commissioner mailed to the wrong address, so the IRS went ahead and levied on his salary in September 2003. Trout complained, but the Commissioner took the position that when Trout didn't timely file his 1998 return and pay the tax due, he was in default on the OIC's condition that he file and pay his taxes on time for five years.

Trout blames the accountant who prepared both his 1998 and 1999 returns, arguing that the accountant put the wrong Social Security number on them by turning a "5" into a "2" and so it was the accountant who caused those returns to lose their way. Trout claims that this was just an honest clerical mistake. The wrong number belonged to a man who died in 1978, however, and the Commissioner has no record of taxes being timely filed for those years under either the correct or the mistaken number. When Trout learned this, he said he would file the missing returns.

The Commissioner's heart then softened--he told Trout to go ahead and mail his missing 1998 and 1999 returns and resubmit the OIC. This got Trout moving, and the Commissioner finally received and filed the missing 1998 tax return in

November 2003 (nearly four years after its extended due date). It showed the IRS owed him a small refund of about $1,350.

Trout's 1999 return remains a problem--the Commissioner claims that he still has not received it in proper form even after all these years, despite several requests and the active involvement of Trout's lawyers.  The Commissioner did receive an unsigned copy of the 1999 return with a self-reported liability of $164 in late 2003.  In December 2003, the Commissioner asked Trout to sign this late-filed 1999 return and send copies of both the 1998 and 1999 original returns (the ones that Trout claimed the IRS must have misfiled because his accountant got the social security number wrong) to prove that he had filed them when due.  Trout never did so, and in March 2004 the Commissioner sent Trout another notice of his intent to levy.[2]  Trout requested a "Collection Due Process" (CDP) hearing.  In May 2004, the Commissioner released the first levy and postponed levying under the second, having concluded that Trout was indeed entitled to a pre-levy hearing.

---

[2] The IRS hadn't released the first levy at this point, but apparently sent this second NIL because such notices are supposed to be sent to a taxpayer's last known address.  Sec. 6330(a)(2)(C); Buffano v. Commissioner, T.C. Memo. 2007-32.

Unless otherwise indicated, all section references are to the Internal Revenue Code; all Rule references are to the Tax Court Rules of Practice and Procedure.

The 1999 return continued to bedevil both parties--on May 14, 2004, the Commissioner told Trout that that return was still unfiled. In November 2004, the Commissioner received another unsigned 1999 return which he promptly sent back for signing. In December 2004--although the Commissioner still hadn't gotten a signed 1999 return--he did get two checks. One was from Trout for $163, and the other one, written by Trout's lawyers, was for $1. The Commissioner incorrectly posted these checks to Trout's 1989 and 1990 accounts.

The missing 1999 return popped up again on January 12, 2005, when Trout's lawyer faxed another unsigned 1999 return with a hand-corrected social security number. The Commissioner again bounced this one back for lack of a signature. Trout's lawyer responded on January 27, 2005, with a letter insisting that Trout had filed his 1999 return (and citing Robinette). In February 2005, Trout's lawyer finally sent in a signed 1999 return, but again with an incorrect social security number.

The CDP process ground on while the 1999 returns were being batted back and forth. In March 2005, the Appeals officer issued a notice of determination upholding the levy, and denying reinstatement of the OIC. The Appeals officer determined that Trout did not timely file his returns for 1998 and 1999 or timely pay the balance due for 1999. (He also noted that Trout had been late in filing his 1996 tax return.)

The Appeals officer concluded that there wasn't a less intrusive alternative to the levy, since Trout offered no collection alternatives besides the reinstatement of the OIC.[3]

Trout contends that the Appeals officer ignored <u>Robinette</u> by not considering whether the alleged nonfiling of the returns was a material breach of contract. The Appeals officer acknowledged that Trout believes <u>Robinette</u> to be the controlling precedent, but concluded in his case memorandum: "In my opinion, whether there was or was not a material breech [sic] of contract does not matter. The taxpayer failed to comply with the terms of the [OIC]."

The case was set for trial in Chicago, though Trout was a resident of Arizona when he filed his petition.[4] The parties submitted the case for decision under Rule 122, and stipulated most of the record. They disagree only on whether Trout timely filed his 1998 and 1999 tax returns, whether he timely paid his 1999 tax due, and whether a letter from the USPS can be introduced into evidence. Only Trout's tax liability for 1993 remains at issue, because the Commissioner has conceded that

---

[3] Trout had asked for an installment agreement in his request for a CDP hearing, but he never pursued the issue at that hearing or in his petition to our Court.

[4] This means that any appeal would lie to the Ninth Circuit unless the parties stipulate otherwise. See sec. 7482(b)(1)(A) and (2).

the statute of limitations for collection after assessment has expired for tax years 1989, 1990, and 1991.

Trout argues that the Appeals officer abused his discretion in refusing Trout's request to reinstate his OIC. He relies heavily on the similarities between his case and Robinette, and so argues that even if he didn't file his returns, the Commissioner should still have reinstated the OIC because his purported breach is immaterial. He also asserts that the ten-year collection statute has expired even for 1993.[5]

## Discussion

Both parties agree that we're reviewing not a challenge to Trout's underlying tax liability, but only the Commissioner's decision to sustain the levy. See sec. 6330(c)(2)(A). The question therefore is whether the Commissioner abused his discretion. We look to see if he "'ma[de] an error of law * * * or rest[ed] [his] determination on a clearly erroneous

---

[5] Trout does not, however, argue the point at any length. Nor could he do so successfully, because the 1993 tax was assessed on May 6, 1996. Section 6502(a)(1)'s ten-year period for collection began on that date, but it is tolled during the pendency of an OIC, a CDP hearing, and a Tax Court case. Secs. 6330(e)(1), 6331(i)(5) and (k)(1), 6502(a), and 6503. Even disregarding language in paragraph 7(n) of the OIC waiving the statute of limitations, the statute was at least tolled from the date of the OIC's submission to the date of its acceptance (from June 10, 1996 to January 15, 1997), during the CDP hearing process (from April 5, 2004 to March 3, 2005), and while this case is pending in our Court. This is more than enough time to keep this case within the ten-year limitation period.

finding of fact * * * [or] applie[d] the correct law to the facts which are not clearly erroneous but rule[d] in an irrational manner.'" Indus. Investors v. Commissioner, T.C. Memo. 2007-93 (quoting United States v. Sherburne, 249 F.3d 1121, 1125-26 (9th Cir. 2001)); see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402-03 (1990).

In Robinette, we held that the Commissioner abused his discretion by not reinstating an OIC despite Robinette's failure to timely file his tax returns. In that case, we held that

> [d]espite the late filing * * *, under the facts and circumstances of this case, [the Commissioner] abused his discretion in determining to proceed with collection. The Appeals officer acted arbitrarily and without sound basis in law and had a closed mind to the arguments presented on petitioner's behalf. He failed to consider the facts and circumstances of this case. He determined to proceed with collection even though the breach in the contract was not material and under contract law the contract remained in effect.

123 T.C. at 107.

Trout argues that his case is just like Robinette's--even the Appeals officer in this case is the same--and so he argues that we have to reach the same result here, even though we were reversed on appeal.[6] He claims that his case is even stronger

---

[6] We follow our reviewed opinions in later cases, Lawrence v. Commissioner, 27 T.C. 713, 717 (1957), revd. on other grounds
(continued...)

than Robinette's because the facts show that he didn't actually breach his OIC, much less breach it materially.

We first address whether the Commissioner erred in finding that Trout breached the OIC by not timely filing his 1998 and 1999 returns.  We then analyze whether our decision in Robinette compels us to hold that the OIC was still in effect because any breach was not material.  And, finally, we review the Commissioner's exercise of discretion in ultimately sustaining the levy.

A.    Did the Appeals Officer Abuse his Discretion in
      Finding that Trout Didn't Timely File and Pay
      for 1998 and 1999?

Trout claims that he timely filed his returns for 1998 and 1999.  He argues that his accountant prepared returns for both years, but explains the absence of any IRS record of their receipt by suggesting that they might have been filed under the wrong social security number.  We're skeptical about this explanation at the outset, because Trout filed requests for

---

⁶(...continued)
258 F.2d 562 (9th Cir. 1958), unless doing so would as a practical matter be pointless, because appeal lies to a circuit court that has ruled to the contrary, Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  But nothing in Golsen or in Lawrence precludes us from revisiting an issue, as we do here, when the issue on which there has been an intervening reversal arises anew.  We said in Lawrence, 27 T.C. at 717, that in these circumstances, we "must thoroughly reconsider the problem in the light of the reasoning of the reversing appellate court and, if convinced thereby, the obvious procedure is to follow the higher court."

extensions of his filing deadlines for both those years using the same wrong social security number, and the Commissioner managed to successfully process both of them.

The Commissioner also argues that it's up to Trout to prove timely filing. And, other than unsigned copies of his returns, Trout points to nothing in the record (e.g. a certified mail receipt) that proves he mailed the returns, proffered no testimony from his accountant, and most importantly, introduced no canceled checks or bank records suggesting that he timely paid the balance due on his 1999 taxes, or received his refund for 1998. When the Appeals officer checked IRS records for Trout's 1999 tax return, he found that it still hadn't been processed as of January 12, 2005--despite numerous requests for a signed 1999 tax return and the assistance of two attorneys from two different law firms.

The general rule is that a tax return is filed when it's received. United States v. Lombardo, 241 U.S. 73, 76 (1916). Section 7502 provides exceptions to this general rule for returns received after, but postmarked by the USPS on or before, their due date--and even for returns not received at all if they were sent by registered or certified mail. Sec. 7502; sec. 301.7502-1(c)(1)(iii)(A),(2), Proced. & Admin. Regs. Trout's original returns were never received. And there is no

evidence in the record of either a postmark, or a certified or registered-mail receipt.  Sec. 7502(a)(1) and (c).  This was also an issue in Robinette, but in that case there was a detailed explanation of the postmark, physical evidence of the postmark, and a detailed itinerary of the whereabouts of the accountant who mailed the return.  Robinette, 123 T.C. at 88, 106.

Some courts allow other evidence that the taxpayer has fulfilled the requirements of section 7502.  In Anderson v. United States, 966 F.2d 487, 490-92 (9th Cir. 1992), the Ninth Circuit held that although section 7502 created a statutory mailbox rule, it did not displace the common-law mailbox rule that the proper mailing of an envelope creates a rebuttable presumption of its receipt.  But this presumption, absent physical evidence such as a postmark, requires a finding on the credibility of the taxpayer.  In Anderson v. United States, 746 F. Supp. at 15,(E.D. Wash. 1990), the District Court found credible the taxpayer's testimony that she saw the postal clerk postmark her return and place the envelope in the mail.  The Anderson court also found that the government lacked credibility when it claimed not to have received the tax return, since it admitted losing other taxpayers' documents. Id. at 16.

Because Trout submitted this case for decision without trial under Rule 122, we are unable to make findings of credibility on this issue.  Nor has Trout offered any evidence to prove that he ever mailed his tax returns before the IRS started levying on his property, much less that he timely mailed them.  So Trout cannot rely on any presumption of delivery.  Cf. Robinette, 123 T.C. at 106.

Even if the Appeals officer had found that Trout timely mailed his tax returns, the Commissioner rebutted whatever advantage the common-law mailbox rule might have given Trout. See Smith v. Commissioner, T.C. Memo. 1994-270, affd. without published opinion 81 F.3d 170 (9th Cir. 1996).  The Commissioner's evidence of nonreceipt was overwhelming:  The Appeals officer conducted a nationwide search on the master files of the IRS to see if any return had been filed for 1998 or 1999 under either Trout's real social security number or the one he says he used.  The Commissioner also notes that the IRS issued no refund for 1998, even though Trout requested a refund on his return.  And Trout offered no proof that he received the refund he was owed on his 1998 taxes.  As for the 1999 tax year, the IRS had no record of a timely $164 payment, and Trout has no canceled check to back up his claim.

We conclude that the Appeals officer did not clearly err in finding that the IRS did not receive the 1998 and 1999

returns on time.  See <u>Walden v. Commissioner</u>, 90 T.C. 947, 951-52 (1988).  We therefore find no abuse of discretion in his determination that Trout failed to timely file those returns.

But was that enough to justify the Commissioner's decision to pull the OIC?

B.   <u>Did the Appeals Officer Abuse His Discretion in Defaulting the OIC</u>?

Trout believes that his case is exactly like <u>Robinette</u>, and he specifically appeals to our holding that Robinette's failure to timely file was not a material breach of his OIC.  Because the breach wasn't material, we held that the OIC was still in effect under general principles of contract law.  <u>Id.</u> at 108 (citing <u>TXO Prod. Corp. v. Page Farms, Inc.</u>, 698 S.W.2d 791, 793, (Ark. 1985)).  And since "the offer-in-compromise was not in default, it was an abuse of discretion for [the Commissioner] to determine to proceed with collection of [Robinette's] tax liability."  <u>Robinette</u>, 123 T.C. at 112.

In this case, the Appeals officer decided that Trout breached his OIC by not timely filing his 1998 and 1999 returns, not timely paying his 1999 taxes, and because timely filing and paying was an express condition of the OIC.  The Appeals officer knew about <u>Robinette</u>, but believed that Trout's noncompliance with the express terms of the OIC made irrelevant the materiality of those breaches.  After the Eighth Circuit issued its opinion, we have faced a similar problem at least

- 16 -

twice.  But in both Ng v. Commissioner, T.C. Memo. 2007-8, and

West v. Commissioner, T.C. Memo. 2008-30, we were able to

conclude that the taxpayer had both materially breached his OIC

and violated its express conditions.

We think it best now to decide the issue of whether the

Commissioner should analyze violations of OICs for materiality

of breach or express conditions, rather than require both the

Commissioner and taxpayers to argue both theories in every case

because of the uncertainty now present in the caselaw.

We start by being precise in describing what it was that

we held in Robinette.  We began with the proposition that OICs

are contracts, and so their construction is governed by general

principles of contract law.  Id. at 108  Our lead opinion cited

Arkansas law--Robinette being a resident of Arkansas when he

filed the petition and during the tax years at issue--for the

proposition that a material breach discharges a party's

obligation to perform, whereas a minor breach does not.  Id.

We then analyzed whether the breach was material under the

five-factor test from 2 Restatement, Contracts 2d, sec. 241

(1981), carefully noting that Arkansas had adopted this

analysis.  These five factors balance:

> (a)  the extent to which the injured party
>      (here the Commissioner) is deprived of
>      the benefit he reasonably expected from
>      entering into the OIC;

> (b)  the extent to which the Commissioner
> is adequately compensated for the loss  of
> that benefit;
>
> (c)  the extent to which the breaching
> party (here the taxpayer) suffers
> forfeiture;
>
> (d)  the probability that the breaching
> party will cure his breach, taking
> into account all of the circumstances
>        including "reasonable assurances"; and
>
> (e)  the extent to which the breaching
>      party's behavior comports with standards
>      of good faith and fair dealing.

After balancing these factors, we found that the breach wasn't material.  Robinette, 123 T.C. at 112.

This opinion garnered the votes of 6 of the 17 judges then in office.  It also attracted a number of concurrences.  Judge Wells wrote that our focus on contract law was unnecessary in deciding that the Commissioner abused his discretion, and that Appeals officers shouldn't be "required to rigidly apply contract law."  Id. at 112-13.  He would have focused the analysis on whether the Appeals officer conducted a proper balancing analysis of the competing interests of the taxpayer and Commissioner under section 6330(c)(3)(C)--the intrusiveness of collection action with the Commissioner's interest in efficient tax collection.  Id. at 113.  His position attracted 4 other votes, including 2 from judges who also agreed with the lead opinion.

Judge Thornton's concurrence emphasized that a taxpayer's "express agreement" to timely file his returns is an "integral condition" to the Commissioner's acceptance of the OIC, and that such a condition is reasonable because it merely confirms a statutory obligation even in cases where a refund is due. Id. at 116. This position won the approval of a majority of the Court--11 of 17, including 5 of the 6 votes in favor of the lead opinion.

Judge Marvel's concurrence questioned the lead opinion's reliance on principles of contract law, but concluded that the Appeals officer's failure to investigate whether the OIC could be reinstated (when this was obviously an important collection alternative) was a more than sufficient basis to sustain a finding of abuse of discretion. Id. at 117-18. Her position was joined by two judges, one of whom had supported the lead opinion, and one who had joined Judge Wells's concurrence.

And Judge Haines wrote to warn specifically that the lead opinion's citations to Arkansas state law shouldn't be construed as requiring the use of the law of a taxpayer's state of residence rather than general contract principles. Id. at 118. He warned of the "administrative nightmare" that would result from requiring Appeals officers to apply state, rather than general, contract law. He also noted that the Internal Revenue Manual said that an OIC may be defaulted when

subsequent tax returns aren't timely filed.  Id. at 119.  This position was supported by 2 other judges.

Judge Wherry's concurrence didn't touch on any questions of contract law, and the dissent (which gathered only 2 votes), only echoed the concerns of Judge Haines's concurring opinion on this point.  Id. at 130 n.8.

Given the multiple opinions in Robinette, it is not clear whether a majority of the Court supported the possible reliance on Arkansas contract law--on that issue, the vote seems to have been 6-5 (the lead opinion having 6 votes, and the dissent plus Judge Haines's concurring opinion together having 5).  This led the Eighth Circuit on appeal to be unsure whether we had. Robinette, 439 F.3d at 462 n.6.  That court made it clear nevertheless that it thought federal, rather than state, common-law principles govern OICs.  Id. (citing United States v. Kimbell Foods, Inc., 440 U.S. 715, 726 (1979)).

In light of the Eighth Circuit's reversal, we think it necessary to clarify our position in Robinette that the "general principles of contract law" that we applied in Robinette are the general principles of the federal common law of contracts.  See West v. Commissioner, T.C. Memo. 2008-30 (citing Dutton v. Commissioner, 122 T.C. 133, 138 (2004)).  See also Clearfield Trust Co. v. United States, 318 U.S. 363, 366-67 (1943).

We have several reasons to do so.  First, this is litigation between an agency of the federal government and a taxpayer.  Though not sufficient in itself, this is a factor weighing in favor of using federal common law.  See Boyle v. United Techs. Corp., 487 U.S. 500, 504 (1988).  Second, OICs are a creation of several provisions of the Code and regulations--all federal law.  See Kimbell Foods, 440 U.S. at 726, 728.  It is also a program that the IRS has to run across the country, and the "administrative nightmare" that Judge Haines referred to in his concurrence supports a uniform national legal standard for construing OIC agreements.  These three factors--a federal government agency as litigant, contracts entered into under federal law, and the need for nationwide uniformity in administration, all point us to the federal common law of contracts as our source of rules.  See Boyle, 487 U.S. at 504; Kimbell Foods, 440 U.S. at 728.

Our cites to Arkansas law in Robinette should henceforth be taken to illustrate general principles of the federal common law of contracts.  That many states--like Arkansas--use the Restatement of Contracts tends to prove that the Restatement is a good source for discerning these general principles.  Courts applying federal common law find in the Restatement "the standard principles of contract law--more precisely, the core principles of the common law of contract that are in force in

most states."  United States v. Natl. Steel Corp., 75 F.3d 1146, 1150 (7th Cir. 1996) (citing Fleming v. United States Postal Serv., 27 F.3d 259, 260-61 (7th Cir. 1994)).

Precedents from the Court of Federal Claims are also a rich source of this federal common law.  And that court, like the Restatement, tells us to give contractual language the "meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances. * * * [A] court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless."  Gutz v. United States, 45 Fed. Cl. 291, 296-97 (1999) (citations omitted); see also 2 Restatement, Contracts 2d, sec. 203(a) (1981).

The interpretation of the OIC agreement is crucial here because the parties disagree about whether the five-years-of-timely-filing requirement is an "express condition."  Trout claims that even if he didn't timely file and pay, his breach is immaterial.  But it is literally hornbook law that an express condition is subject to strict performance, thus making the materiality of the breach irrelevant.  Calamari & Perillo on Contracts, sec. 11.15 (5th ed. 2003).  So if Trout's obligation to file and pay taxes is an express condition, strict performance is required, and filing late for even one year is enough to find that he breached the OIC.

Whether a condition is an express condition is a matter of contractual interpretation.  <u>Id.</u>  Express conditions can be made by agreement of the parties, and there are certain words that are often used to create express conditions such as "on condition that", "provided that", and "if".  2 Restatement, Contracts 2d, sec. 226 cmt. a (1981).  The Ninth Circuit, applying federal common-law principles, has favored interpretation of OICs according to the plain meaning of their words, unless the parties manifest a different intention.  <u>Johnston v. Commissioner</u>, 461 F.3d 1162, 1165 (9th Cir. 2006), (citing 2 Restatement, sec. 202(3)), affg. 122 T.C. 124 (2004).

The OIC agreement that Trout signed says in bold type in paragraph 7:

> By submitting this offer, **I/we understand and agree to the following terms and conditions**:
>  * * *
>
> (d) I/we will comply with all provisions of the Internal Revenue Code relating to filing my/our returns and paying my/our required taxes for five (5) years from the date IRS accepts the offer,
> * * *
>
> (j) I/we understand that I/we remain responsible for the full amount of the tax liability unless and until IRS accepts the offer in writing and I/we have met all the terms and conditions of the offer.  IRS won't remove the original amount of the tax liability from its records until I/we have met all the terms and conditions of the offer.

(k)  I/we understand that the tax I/we offer to compromise is and will remain a tax liability until I/we meet all the terms and conditions of this offer.* * *

(o) If I/we fail to meet any of the terms and conditions of the offer, the offer is in default, and IRS may:

 *    *    *    *    *    *    *

(iii) disregard the amount of the offer and apply all amounts already paid under the offer against the original amount of tax liability;

The "Instructions" part of the OIC agreement says in the "Tax Compliance" paragraph: "Please note that the terms of the offer also require your future compliance (i.e. filing and paying for five years) after acceptances."  And it cautions in item 7:

It is important that you understand that when you make this offer, you are agreeing that:

* * *(d) [I]RS can reinstate the entire amount owed if you don't comply with all the terms and conditions of the offer, including the requirement to file returns and pay tax for five years.

The Commissioner could hardly have used plainer language to explain the terms and conditions of the OIC or to express his intent.  He repeatedly cautioned the taxpayer who signs the OIC: "It is important that you understand that", and "Please note that"; he used a bold font, and he stated that he can reinstate the original liability for failure to meet any of the

terms and conditions in paragraph o. Finally, just to be sure that Trout understood that the terms of the offer required timely filing and payment for five years after entering into the OIC, the OIC form lists it clearly and in boldface, as a "term and condition" in paragraph d. It's listed on the Instruction part of the OIC agreement to boot.

Courts may in borderline cases nevertheless favor construction against finding an express condition, especially if doing so would avoid a forfeiture. 2 Restatement, Contracts 2d, sec. 227 and cmt. b (1981). This is also true if the occurrence or nonoccurrence of a condition was outside the contracting party's control. Id. But there's neither a risk of forfeiture nor evidence that Trout was powerless to avoid a breach here. There's no forfeiture because payments Trout made under the OIC remain credited to his account, and there's nothing in the record to suggest that the timely filing of his tax returns was not under his control. In any event, we don't have to rely too much on general principles of the contract law of express conditions--other federal courts construing OICs have already upheld the Commissioner's right to cancel them when a taxpayer defaults because the agreement expressly provided "with language * * * so precise, and the intention which it manifests is so evident, as to leave no doubt that the course of action taken by the Government here was fully

authorized by the compromise agreement." United States v. Lane, 303 F.2d 1, 4 (5th Cir. 1962). The Third Circuit had similarly held that the Commissioner could default an OIC when a taxpayer failed to make a payment because "[b]y the clear language of the offer-in-compromise [the taxpayer] agreed that, upon his default, the Commissioner * * * could terminate the compromise agreement." United States v. Feinberg, 372 F.2d 352, 357-58 (3d Cir. 1965). The court relied on this conclusion in Fortenberry v. United States, 49 AFTR 2d 82-1027, 82-1 USTC par. 9191 (S.D. Miss. 1981), to hold that the Commissioner could declare a compromise agreement in default when the taxpayer didn't make payments as agreed. And of course, the Eighth Circuit in Robinette itself held that the terms of an OIC were express conditions. Robinette, 439 F.3d at 462.

So we hold that the Appeals officer committed no error of law in concluding that Trout's timely-filing-and-paying requirement was an express condition of his contract with the IRS, and that it required strict compliance to avoid breach-- making the question of whether his breach was material irrelevant. Or, as the Ninth Circuit has said in reviewing the obligations of an OIC: "[A] deal is a deal, even with the tax man." Johnston, 461 F.3d at 1164.

C.    Did the Appeals Officer Abuse His Discretion in Sustaining the Levy?

Even though we hold timely filing and payment was an express condition, and so agree with the Appeals officer that Trout did breach his OIC agreement, we must not end our analysis there.  Section 6330(c)(3)(C) commands the Commissioner to balance the need for efficient collection of taxes with the legitimate concern that collection be no more intrusive than necessary.  In Robinette, we found that the Appeals officer "had a closed mind to the arguments presented on petitioner's behalf" in deciding to proceed with collection even though the breach in the contract wasn't material.  Id. at 107.  A major conclusion of the lead and concurring opinions was that the Commissioner abused his discretion in not carrying out his mandate under section 6330 to conduct the required balancing analysis.  We homed in on the Commissioner's refusal even to consider reinstatement of the OIC as proof that his analysis was flawed.

This case is different.  Here the Commissioner did not lightly default the OIC and reinstate the liability for a *de minimis* fault, but made several efforts to bring Trout back into the taxpaying fold.  First, he ignored Trout's late filing in 1996.  When the 1999 tax return wasn't filed, he waited almost two years before sending a potential OIC default letter, even though the terms of the OIC said that the OIC could be

defaulted without warning if it wasn't strictly complied with. Although Trout claims to have received no notice, it's understandable why the Appeals officer might not have found this claim credible since this letter was also mailed to his lawyer and it's improbable that neither received the letter. Nor is there any evidence from the lawyer on this point. And although the potential OIC default letter warned Trout that he had 30 days to pay his taxes, the Commissioner actually waited almost seven months to default the OIC.

The Appeals officer understood even then that he had the discretion to excuse the breach of the express condition and reinstate the OIC. He chose not to. This is understandable-- Trout's only consideration for the potential forgiveness of almost 95 percent of his tax debt was his promise to timely file and pay his taxes for five years after the OIC. In Robinette, the consideration given by the taxpayer for the OIC was not only a timely-filing-and-paying promise but also an agreement to pay substantial portions of his income exceeding $100,000. Not so here: All the IRS was getting other than the small $6,000 in upfront money was Trout's promise to comply with the law. This focused the Appeals officer's concentration on Trout's compliance history (both before and after the OIC)-- which featured multiple requests for extensions of his filing deadlines, followed by returns that he filed late or not at

all.  Trout also offered no other collection alternatives, such as an installment agreement, even though he was doing fairly well.[7]

The Appeals officer balanced the competing interests of the taxpayer and Commissioner, as required under section 6330(c)(3)(C).  Stated in the OIC agreement itself is the paragraph entitled "IRS policy," which told Trout that the purpose of the OIC program is to give taxpayers a fresh start in tax compliance by allowing them to settle tax debts for less than they owe.  This is undermined if a taxpayer can reduce his liabilities with an OIC, yet still indulge in late-filing recidivism.  The record before the Appeals officer here was not the record before him in Robinette, where, for example, the taxpayer probably missed one filing deadline by only a few hours.  439 F.3d at 459 n.2.  It is instead the story of a taxpayer who filed months late or not at all for three of the five years after he signed the OIC.

The stated goal of the OIC program--returning wayward taxpayers to the path of tax righteousness--would be entirely blocked if we were to hold that the express condition of timely

---

[7] Unlike Robinette, who had an annual income of less than $100,000 in tax years 1995-99, but whose reinstated tax liability was for roughly $1 million, Robinette, 123 T.C. at 86 n.2, Trout had earned between $130,000 and $836,000 annually in the three years before his request for a CDP hearing.  And by the time the Commissioner got around to collecting Trout's tax debt, the statute of limitations had run on all but one year, leaving him with a reinstated liability of less than $90,000.

filing agreed to by a taxpayer really meant that he could file returns late as long as they showed a net refund. We'd be stripping the Commissioner not only of his chosen remedy (reinstatement of the original debt), but also of his chosen emphasis on a taxpayer's future compliance as an aim of the OIC program.

We therefore find that the Appeals officer didn't abuse his discretion in not excusing an express condition of Trout's contract with the IRS. The Appeals officer considered reinstatement of the OIC as a collection alternative, but believed that Trout wasn't entitled to a second chance after looking at his pattern of noncompliance. Moreover, Trout's failure to successfully file his 1999 return (which he just had to sign and file under his correct social security number), even with the help of two attorneys, and even while the CDP hearing was pending, reasonably failed to inspire the Appeals officer's confidence that Trout was serious about timely filing and paying his taxes going forward.

In conclusion, we sustain the Appeals officer's finding that Trout didn't timely file his returns for 1998 and 1999 or

timely pay his tax for 1999, and also sustain his decision not to reinstate the OIC.  Accordingly,

<u>An order and decision</u>

<u>for respondent as to tax</u>

<u>year 1993 will be entered</u>.

Reviewed by the Court.

COHEN, WELLS, HALPERN, FOLEY, GALE, THORNTON, HAINES, GOEKE, WHERRY, KROUPA, GUSTAFSON, PARIS, and MORRISON, JJ., agree with this majority opinion.

MARVEL, J., concurring in the result:  I agree with the result reached by the majority.  I write separately, however, to emphasize the obligation of the Appeals Office of the IRS to verify whether applicable administrative procedures governing the default of an offer-in-compromise (OIC) were followed in a section 6330 proceeding involving a defaulted OIC for an alleged breach of the OIC's timely filing/payment provision (compliance provision).  Although petitioner clearly breached his OIC and the IRS properly exercised its discretion in reinstating petitioner's original tax liability, there have been and no doubt will be other cases where that conclusion is not so evident.

The majority points out that an express condition is subject to strict performance.  See majority op. p. 21.  It then examines the language of the OIC and concludes that petitioner's obligation to file timely returns and to pay all required taxes for a 5-year period beginning on the date the OIC is accepted is an "express condition" of the IRS's obligation to perform under the OIC.  The majority holds "that the Appeals officer committed no error of law in concluding that * * * [petitioner's] timely-filing-and-paying requirement was an express condition of his contract with the IRS, and that it required strict compliance to avoid breach--making the

question of whether his breach was material irrelevant."
Majority op. p. 25.

The majority quotes from the OIC to which petitioner and
the IRS agreed to be bound.  The relevant language of the OIC
states that (1) if the taxpayer fails to meet any of the terms
and conditions of the offer, "the offer is in default";[1] and
(2) the IRS may take certain actions because of the taxpayer's
failure, including reinstating and collecting the compromised
liability.  See 2 Administration, Internal Revenue Manual (IRM)
(CCH), pt. 5.19.7.3.26(1), at 18,537 (Dec. 5, 2006).[2]  However,
the OIC does not state that the IRS must terminate it (or that
the OIC automatically terminates) in the event of a breach.
Rather, the OIC states that the IRS may terminate it (by
reinstating the original liability and collecting it).  I
construe this language as giving the IRS discretion to

---

[1]The IRM seems to use the term "default" in two different
contexts.  It uses the term "default" to describe the situation
when a taxpayer reaches potential default status by not adhering
to the compliance provisions of the offer.  See, e.g., 1
Administration, IRM (CCH), pt. 5.8.9.3(1)(B), at 16,404 (Sept.
23, 2008).  It also uses the term "defaulted" to describe the
process of reinstating the original liability.  See, e.g., 2
Administration, IRM (CCH), pt. 5.19.7.3.27(1), at 18,551 (Dec. 5,
2006).  For purposes of this concurrence, I use the term "breach"
to mean a failure to comply with the OIC's compliance provision
and "terminate" or its derivative to refer to the process of
reinstating the original liability because of a breach.

[2]References to the IRM are to the current edition.

terminate an OIC if the taxpayer breaches one of the OIC's terms and conditions.

The discretion that I believe the OIC confers on the IRS to deal with a breach of the compliance provision is also reflected in the procedures that IRS personnel are expected to follow in monitoring an OIC and determining a course of action in the event of an alleged breach.  The IRM contains provisions that instruct IRS personnel how to proceed with potential default cases.  For example, 1 Administration, IRM (CCH), pt. 5.8.9.3(1)(B), at 16,404 (Sept. 23, 2008), states that an offer can reach "potential default status" if "The taxpayer has not adhered to the compliance provisions of the offer".  In such cases, the "Campus MOIC [Monitoring Offer in Compromise] units have responsibility and authority to make determinations on potential offer default cases", 1 Administration, IRM (CCH), pt. 5.8.9.3(2), at 16,404 (Sept. 23, 2008), pursuant to procedures currently set forth in 2 Administration, IRM (CCH), pt. 5.19.7.3.26.5, at 18,544-18,550 (Dec. 5, 2006).  The IRM further states:

> The MOIC unit will make an attempt to secure compliance.  If the taxpayer fails to comply with any requests for delinquent returns or payments, the MOIC unit will default the offer.  After all appropriate letters have been sent, generate a * * * [Taxpayer Delinquent Investigation] or * * * [Taxpayer Delinquent Account], as appropriate and close the case as a default.  [1 Administration, IRM (CCH), pt. 5.8.9.3(3), at 16,404 (Sept. 23, 2008).]

The procedures that the MOIC units are expected to follow when a potential default is attributable to the taxpayer's alleged failure to file a required return include sending a letter to the taxpayer about the missing return.  See 2 Administration, IRM (CCH), pt. 5.19.7.3.26.5(7), at 18,544-18,545 (Dec. 5, 2006).  Under IRM procedures the taxpayer is supposed to be given an opportunity to explain why a return is not due and/or to file the delinquent return if one is due and unfiled.  See 2 Administration, IRM (CCH), pt. 5.19.7.3.26.5(8), at 18,545-18,548 (Dec. 5, 2006).  Only after IRS employees have followed the procedures governing "Failure to Adhere to Compliance Terms" are the employees instructed to process a default in accordance with the provisions of the IRM. See, e.g., 2 Administration, IRM (CCH), pt. 5.19.7.3.26.5(7) and (8).  The IRM recognizes that it may not always be in the best interests of the IRS to terminate an OIC even though the taxpayer has breached one of the OIC's terms and conditions. See, e.g., 2 Administration, IRM (CCH), pt. 5.19.7.3.27(3) at 18,552 (Dec. 5, 2006).

The majority points out that section 6330(c)(3)(C) requires the Appeals Office, in making its determination, to take into consideration "whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the person that any collection action

be no more intrusive than necessary." The majority's analysis
on this point distinguishes the factual situation in Robinette
v. Commissioner, 123 T.C. 85 (2004), revd. 439 F.3d 455 (8th
Cir. 2006), and emphasizes that "the Commissioner did not
lightly default the OIC and reinstate the liability for a de
minimis fault, but made several efforts to bring * * *
[petitioner] back into the taxpaying fold." Majority op. p.
26.

The "Discussion and Analysis" attached to the notice of
determination issued to petitioner summarily states that "All
legal and procedural requirements are concluded to have been
met in this case" without specifying whether the Appeals Office
verified that the procedures specified in the IRM for
terminating an agreed OIC for noncompliance with the OIC's
compliance provision were followed. Nevertheless, the facts
recited in the attachment to the notice of determination and as
found by the majority confirm that the Appeals officer verified
the IRS had warned petitioner about his missing returns and had
given him an opportunity to file the missing returns before the
IRS terminated the OIC and decided to proceed with collection
by levy. The facts recited in the attachment to the notice of
determination also confirm that unlike the taxpayer in
Robinette who had missed one filing deadline by only a few
hours, see majority op. p. 28, petitioner had an extended post-

OIC record of noncompliance that the Appeals Office took into account in deciding whether the levy could proceed. In addition, petitioner did not offer any collection alternative other than the reinstatement of the original OIC.[3] Consequently, I agree with the majority's conclusion that the Appeals Office did not abuse its discretion in determining that the proposed levy can proceed.

I remain concerned, however, about how the Appeals Office articulates, and will continue to describe, its obligations under section 6330 in a case involving the termination of an OIC where the IRS does not attempt to notify a taxpayer of an alleged failure to satisfy the OIC's compliance provision or to

---

[3]The part in the IRM captioned "Actions on Defaults Offers" contains a provision that states: "The Service may accept a compromise of a compromise" and "There is no standard form for such a proposal." 4 Administration, IRM (CCH), pt. 8.23.3.13(7), at 27,997-487 (Oct. 16, 2007). A taxpayer who has breached the compliance provision of an OIC might propose a new OIC containing substantially the same terms as the previous OIC or different terms (e.g. an enhanced compliance period, a collateral agreement, an additional lump-sum payment or deferred payment) designed to convince the IRS that it is still in the best interests of the IRS to compromise the liability despite the taxpayer's breach. A taxpayer might also propose other collection alternatives such as an installment agreement, a third-party payment or transfer of an asset that is otherwise unavailable to the IRS. In this case, the only collection alternative apparently presented by petitioner was the reinstatement of the original OIC. The IRS, however, has taken the position that "If the hearing officer determines that there was a default, the termination of the OIC was legally authorized; neither Headquarters nor the Office of Appeals can 'reinstate' the OIC." 4 Administration, IRM (CCH), pt. 8.22.2.2.9(1), at 27,997-366 (Dec. 1, 2006); see also Chief Counsel Advice 200113031 (Mar. 30, 2001).

provide the taxpayer with a reasonable opportunity to cure an alleged breach of that provision, or where the totality of the facts and circumstances reveals an immaterial breach in Robinette parlance.  See Robinette v. Commissioner, supra at 108-112.  Although this Court and others have held that procedures set forth in the IRM "do not have the force or effect of law" and a failure to adhere to them does not rise to the level of a constitutional violation, see, e.g., Vallone v. Commissioner, 88 T.C. 794, 807-808 (1987) (checks obtained in violation of IRM not a constitutional violation requiring suppression); Riland v. Commissioner, 79 T.C. 185 (1982) (failure to abide by IRM procedures not a violation of due process), and that the IRM does not create any enforceable rights for taxpayers, see Fargo v. Commissioner, 447 F.3d 706, 713 (9th Cir. 2006), affg. T.C. Memo. 2004-13, section 6330(c)(1) specifically requires that the Appeals officer at the section 6330 hearing shall obtain verification from the Secretary that the requirements of any applicable law or administrative procedure have been met.  Moreover, section 6330(c)(3) provides that the determination by an Appeals officer under section 6330(c) shall take into consideration the verification presented under section 6330(c)(1).

In Chief Counsel Notice CC-2006-019 (Aug. 18, 2006), respondent's Office of Chief Counsel describes what an Appeals

officer dealing with a collection due process case is expected to do regarding the section 6330(c)(1) verification requirement:

IV.  Sections 6320 and 6330

5.  Matters considered at hearing

a.  Section 6330(c)(1) verification

Sections 6320(c) and 6330(c)(1) require the appeals officer to obtain verification from the Secretary that the requirements of any applicable law or administrative procedure have been met. Verification can be obtained at any time prior to the issuance of the determination by Appeals.  Treas. Reg. §§ 301.6320-1(e)(1), 301.6330-1(e)(1).  The requirements the appeals officer [is] verifying are those things that the Code, Treasury Regulations, and the IRM require the Service to do before collection can take place.  [Emphasis added.]

The quoted language recognizes that in enacting section 6330, Congress clearly expressed its intention (1) that the IRS present verification during the section 6330 hearing that it followed all applicable administrative procedures before enforced collection action may proceed and (2) that the Appeals officer conducting the section 6330 hearing take that verification into account in deciding whether to proceed with collection.  See sec. 6330(c)(1), (3).

Although there may be an unresolved issue of statutory interpretation regarding the meaning of "any applicable * * *

administrative procedure" under section 6330(c),[4] the IRM contains procedures that the IRS expects its personnel to follow in administering Federal tax law.  See 1 Administration, IRM (CCH), pt. 1.11.2.1.1(1), at _____ (Apr. 1, 2007).[5] More precisely, the IRM contains procedures that IRS personnel are expected to follow before terminating an agreed OIC after a breach of the OIC's compliance provision.  These procedures

---

[4]Compare Drake v. Commissioner, T.C. Memo. 2006-151, affd. 511 F.3d 65 (1st Cir. 2007) with Carlson v. United States, 394 F. Supp. 2d 321, 329 (D. Mass. 2005).

[5]1 Administration, IRM (CCH), pt. 1.11.2.1.1(1), at _____ (Apr. 1, 2007), states in pertinent part as follows:

> The IRM serves as the single, official source of IRS "instructions to staff" relating to the administration and operation of the Service.  The IRM provides a central repository of uniform guidelines on operating policies and procedures for use by all IRS offices.  It contains guidance on IRS policies and directions our employees need to carry out their responsibilities in administering the tax laws or other agency obligations.

Before its amendment in 2007, 1 Administration, IRM (CCH) pt. 1.11.2.1(2), at 5,027 (Oct. 10, 2003), stated in pertinent part as follows:

> The IRM outlines business rules and administrative procedures and guidelines used by the agency to conduct business.  It contains policy, direction and delegations of authority that are necessary to carry out IRS responsibilities to administer tax law and other legal provisions.  The business rules, operating guidelines and procedures and delegations guide managers and employees in carrying out day to day responsibilities. [Emphasis added.]

regarding potential OIC defaults are sensible and reflect the fact that an OIC authorizes but does not require the IRS to terminate the OIC if a taxpayer allegedly fails to comply with his filing obligation under the compliance provision. The IRM procedures instruct IRS employees monitoring OICs to investigate the alleged failure to comply and, if there is such a failure, to give the taxpayer a chance to correct it before a decision is made to default (terminate) the offer. These procedures (which have been in place for many years in one form or another) reflect a wise and balanced approach to monitoring existing OICs and dealing with potential defaults. When the IRS takes the very serious step of terminating an OIC and reinstating a taxpayer's original tax liability, the Appeals Office should verify that the IRS's administrative procedures for defaulting (terminating) the OIC were followed before it sustains a determination to proceed with collection. Sensible tax administration and section 6330(c) would appear to require it.

COLVIN, COHEN, VASQUEZ, GALE, HAINES, WHERRY, and PARIS, JJ., agree with this concurring opinion.