T.C. Memo. 2014-53

UNITED STATES TAX COURT

LEE ANG, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13309-12L.                    Filed March 31, 2014.

<u>Ronald Jay Cohen</u>, for petitioner.

<u>Marissa J. Savit</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  This case involves a nominee and jeopardy levy issued with respect to petitioner's unpaid tax liabilities for 1998, 1999, 2000, and 2001 (years at issue).[1]  Petitioner petitioned the Court under section 6330(d)(1)[2] to review the

_____

[1]In his petition, petitioner also raised his 2002 and 2006 tax years.  Pursuant
(continued...)

[*2] determination of the Internal Revenue Service (IRS) Office of Appeals

(Appeals) sustaining the nominee and jeopardy levy.

FINDINGS OF FACT

Petitioner is a securities trader residing illegally in the United States.[3]  In or

around 1995, shortly after he received a master of business degree from New York

University, petitioner began trading equity stocks using a proprietary method

involving heavy leverage.  Through trading pursuant to his proprietary method,

petitioner grew $11,000 that his uncle lent him into more than $20 million over a

---

[1](...continued)
to our order dated March 25, 2013, petitioner's 2002 and 2006 tax years were
dismissed for lack of jurisdiction.

[2]All section references are to the Internal Revenue Code in effect at all
relevant times, and all Rule references are to the Tax Court Rules of Practice and
Procedure.

[3]Petitioner disputes that he resides in the United States illegally.  On
November 4, 2013, the Court ordered each party to file a memorandum of law
setting forth petitioner's immigration status.  On November 15, 2013, the parties
submitted briefs addressing petitioner's immigration history.  On December 20,
1987, petitioner entered the United States on a B-2 visitor visa.  Afterward,
petitioner remained in the United States, first on an F-1 student visa and later on
an H-1B professional worker visa.  On March 15, 2000, petitioner filed a form
I-485 application for permanent residence status with the U.S. Immigration and
Naturalization Service.  Petitioner's form I-485 application was denied on
September 21, 2004.  Since September 21, 2004, petitioner has remained in the
United States with no valid immigration status.  At trial petitioner claimed that he
chose to abandon his permanent resident application because of the negative tax
consequences of becoming a permanent resident of the United States.

[*3] number of years. Petitioner claims that in or around 1995 he and his uncle entered into an agreement whereby petitioner's trading profits would be split, 93% to his uncle and 7% to petitioner, in return for his uncle's forgiveness of the $11,000 loan. This purported profit-sharing agreement had no end date. In addition, petitioner's uncle had no involvement in petitioner's trading activities.

1.    Tax Returns for 1998 Through 2001

Petitioner failed to timely file his tax returns for the years at issue to report his trading income. Petitioner's 1998, 1999, and 2000 returns were filed on July 21, 2003, and his 2001 return was filed on July 24, 2003. In April 2006, before the expiration of the periods of limitation on assessment, the parties executed Forms 872, Consent to Extend the Time to Assess Tax, extending the periods of limitation on assessment for each of the years at issue until December 31, 2007. In March 2007 the parties executed an additional Form 872 to extend the periods of limitation on assessment until December 31, 2008. Each Form 872 was signed by petitioner's attorney Joe B. Cox.[4]

_____

[4]Petitioner argues that these Forms 872 were not properly executed and thus were invalid. The record does not support petitioner's assertion. Petitioner executed a Form 2848, Power of Attorney and Declaration of Representative, authorizing Joe B. Cox to be his representative, and Mr. Cox signed the Forms 872 to extend the periods of limitation on assessment. Each of these Forms 872 was also signed by a representative of the IRS. We therefore find that the periods of

(continued...)

[*4] 2.      Prior Tax Court Proceeding

On September 17, 2007, respondent issued a notice of deficiency with respect to the years at issue. On December 5, 2007, petitioner filed a petition with this Court at docket No. 28143-07. Shortly before trial was to commence on January 11, 2010, the parties entered into a stipulation of settlement which detailed the facts of the deficiency case. Among the facts petitioner acknowledged was that he had received income from accounts that were held in his relatives' names.

On February 25, 2010, the parties entered into a decision document which set forth the following deficiencies in income tax and additions to tax:

|  |  | Additions to tax | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6654 |
| 1998 | $59,423 | $201,919 | -0- |
| 1999 | 3,962,411 | 1,209,681 | -0- |
| 2000 | 3,922,839 | 984,710 | -0- |
| 2001 | 1,475,791 | 369,939 | $629 |

_____

[4](...continued)
limitation on assessment were validly extended.

**[*5]** The decision document further stipulated that interest would be assessed as provided by law on the deficiencies and additions to tax. On April 13, 2010, respondent assessed that interest in the following amounts:

| Year | Interest |
|------|----------|
| 1998 | $646,697.42 |
| 1999 | 5,005,919.65 |
| 2000 | 3,549,283.01 |
| 2001 | 1,111,380.12 |

In total, petitioner's unpaid tax liabilities for the years at issue were approximately $22 million in 2010.

3.    Jeopardy Levy

On April 13, 2010, respondent assessed all underlying tax deficiencies and additions to tax for the years at issue.[5]

In a detailed 13-page Office of Chief Counsel memorandum dated June 10, 2011, IRS attorney Justin Campolieta recommended that a notice of jeopardy levy

---

[5]The decision of this Court became final on February 25, 2010, and the periods of limitation on assessment remained suspended for 60 days, i.e., until April 26, 2010. See sec. 6503(a)(1). Therefore, respondent assessed all underlying tax deficiencies and additions to tax for the years at issue before the limitation periods had expired.

**[*6]** be served.  Mr. Campolieta summarized the background of petitioner's case

as follows:

> Lee Ang, a joint citizen of Singapore and Belize, is a very
> successful securities trader living illegally in the United States.
> During the tax years 1998 through 2001, Mr. Ang earned millions of
> dollars in trading profits * * * [b]ut he did not immediately file
> income tax returns reporting this income.  It wasn't until after the
> Service opened a substitute-for-return examination of Mr. Ang's
> taxable year 1998 that he submitted delinquent returns for the taxable
> years 1998 through 2002, during July of 2003.
>
> Each of the returns, with the exception of the return for the
> taxable year 2002, reported a significant amount of gross income, but
> Mr. Ang took the position that 93% of that income was allocable to
> his uncle, a foreign national, under a verbal agreement to split profits,
> which Mr. Ang claimed he negotiated with his uncle shortly after
> graduating from N.Y.U. business school in 1995.  <u>By taking this
> position, Mr. Ang drastically reduced his taxable income and reported
> relatively insignificant income tax liabilities for the taxable years
> 1998 through 2001</u>.  [Emphasis added.]

The memorandum also detailed the findings of an investigation conducted

by the IRS Office of Chief Counsel during petitioner's deficiency case.  These

findings were based on a significant number of discovery requests served on

petitioner, dozens of third-party contacts, witness interviews, and numerous

subpoenas.  The IRS Office of Chief Counsel's investigation uncovered that

> Mr. Ang placed significant assets, including marketable and
> closely-held securities and real property, in the names of close family
> members.  In particular, he placed cash in his mother's HSBC account
> in order to purchase a valuable piece of property in Queens that was

[*7] ultimately deeded to his uncle.[6]  Mr. Ang also placed millions of dollars of personal funds in his mother's and uncle's Schwab trading account.  He traded with these funds and earned a significant amount of profits but failed to report these profits or disclose these accounts to the Service.  Millions of dollars of funds in his mother's trading account wire [sic] wired off-shore.[7]  Most recently, a large wire transfer was made from his mother's account to satisfy a mortgage on a piece of property held in the name of 1916 Ocean Ave, LLC.[8]  Mr. Ang also purchased a significant amount of stock in two closely-held corporations (USA Teleport, Inc. and C-Spectra, Inc.) and placed the majority of this stock in the names of family members,

---

[6]At trial petitioner admitted that a house was purchased in Queens in his uncle's name, but claimed that it was a distribution to his uncle under their profit-sharing agreement.  Petitioner, however, admits that his uncle cannot travel to the United States because of health problems.  In addition, the Office of Chief Counsel's investigation revealed that the property was originally purchased in the name of petitioner's mother, Ngaw Chee Ang, and was later transferred to his uncle.  The investigation further revealed that petitioner consistently supplied the address of the Queens property as his home address on documents submitted to banks and other financial institutions.

[7]For example, according to Revenue Officer Mark Skinner's case notes from April 26, 2011, IRS investigations revealed that $1 million from the IB account had been transferred to a Charles Schwab account in Ms. Ang's name, and several wire transfers had been made from the Charles Schwab accounts to foreign bank accounts.  At trial petitioner testified that although he routinely transferred money between accounts to clear trades, pay real estate development costs, and pay household expenses, he had not transferred any money abroad in the past nine years, aside from a $50,000 transfer to his father and uncle.  However, we found petitioner's testimony to be self-serving, evasive, and improbable, and we decline to accept such uncorroborated testimony as true.  See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

[8]1916 Ocean Ave., LLC, owns three real estate properties in Brooklyn, New York, one of which is a real estate project currently under development at 1916 Ocean Avenue.

[*8] including his mother, Ngaw Chee Ang [(sometimes referred to as Ms. Ang)], and uncle, Yong Sai Ang.[9]

The investigation further revealed that petitioner had no assets in his name[10] and that all of his assets (cash, securities, real property, etc.) were held in the names of family members and nominee entities.

One of the financial accounts that the Office of Chief Counsel discovered during its investigation was an online Interactive Brokers (IB) trading account that petitioner had opened in his mother's name. The IB account was funded with wire transfers from accounts held in his uncle's name and from Global Aggressive Speculative Fund, an entity petitioner organized and funded to conduct personal trading activities. With regard to the IB account, the Office of Chief Counsel concluded that

> At various times from 2006 through the present, funds have been wired into and out of the IB account from numerous sources, including domestic and offshore bank accounts held in the names of Mr. Ang's family members.[11]

---

[9]At trial petitioner admitted that he had registered various investment shares in his uncle's name with the Securities and Exchange Commission.

[10]At trial petitioner admitted that he has no bank accounts in his name within the United States.

[11]The investigation uncovered that in one of these transfers, $250,000 had been wired into the IB account from an account which had been opened using his

(continued...)

**[*9]**   Although the IB account is held, in name, by Mr. Ang's mother, Mr. Ang is in control of the account, and as explained above, uses the funds in the account for his own personal investment purposes.  A number of checks and recent wire transfers were paid to Mr. Ang and to entities * * * controlled by Mr. Ang.  Moreover, it is clear that Mr. Ang has control over the funds in the IB account.  While Ngaw Chee Ang lives in Singapore, the IP addresses used to log into the IB account indicate that all online activity has taken place in and around the greater New York City area where Mr. Ang lives.[12]

As of February 2011, there was roughly $3.4 million in equity (cash and securities positions) in the IB account.  Given Mr. Ang's knowledge of the Service's collection activity, coupled with the ease and frequency with which he moves money in and out of this account (including offshore), it is highly unlikely that these funds will remain in this account for an extended period of time.

On the basis of these facts, Mr. Campolieta recommended that the IRS take immediate action to collect from petitioner's numerous nominees, including the IB account held in his mother's name.  On August 18, 2011, respondent served a jeopardy levy on the IB account.[13]

---

[11](...continued) uncle's passport and funded with a $250,000 check.  Both the signature on the passport and the signature on the check, however, had been forged.

[12]At trial petitioner admitted that he has full control over the IB account, and that his mother, who does not speak English or know how to use a computer, is not involved with the management of the account.

[13]The administrative record is ambiguous as to whether the jeopardy levy was served on August 17, 2011, or August 18, 2011.  However, Mark Skinner, the revenue officer who had served the jeopardy levy on petitioner's IB account,

(continued...)

[*10] On August 23, 2011, respondent issued a Letter 2439, Notice of Jeopardy Levy and Right of Appeal, to petitioner. The Letter 2439 notified petitioner that respondent had levied upon the IB account because respondent had determined that petitioner was moving assets out of the Government's reach.[14]

4.      Collection Due Process Proceedings

On September 20, 2011, petitioner sent a self-made document entitled "Request for Administrative Review of Jeopardy Levy" to respondent, in which petitioner stated that he was in the process of negotiating an installment payment schedule to meet his Federal tax payment obligations when the jeopardy levy was served.[15] On September 22, 2011, petitioner mailed a Form 12153, Request for a Collection Due Process or Equivalent Hearing, to respondent. Petitioner proposed

---

[13](...continued)
credibly testified at trial that it had been dated August 17, 2011, because jeopardy levies required prior approval from a group manager, but that it was not mailed until August 18, 2011. Mr. Skinner's testimony is further corroborated by his notes in the Integrated Collection System history transcript.

[14]Contrary to petitioner's assertions, the Letter 2439 was signed by a representative of the IRS, Mr. Skinner, and included his contact telephone number.

[15]In a memorandum of law dated December 9, 2013, respondent conceded that petitioner's letter was a proper request for administrative review under sec. 7429(a)(2).

[*11] an offer-in-compromise as a collection alternative and objected to the jeopardy levy.

    a.    <u>Petitioner's Offer-in-Compromise</u>

On October 6, 2011, petitioner's then attorney, Stephen B. Kass, faxed a message to respondent requesting withdrawal of the levy.  On October 20, 2011, petitioner mailed to respondent a Form 656, Offer in Compromise, offering to compromise his unpaid tax liabilities for $8,877,900 based on doubt as to collectibility.  The unpaid tax liabilities were to be paid in 101 monthly installments of $87,900.  Attached was a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, and financial documents which purported to show petitioner's net worth to be $8,882,411.  Petitioner based his offer on the following assets:

(1) $1,411 cash from his bank accounts;

(2) sundry assets he valued at $12,000;

(3) a Spyder race car valued for tax purposes at $48,000;

(4) an interest in 1916 Ocean Ave., LLC, which he valued at $3,272,000; and

(5) investment accounts (no detailed listing provided) totaling $5,549,000.

[*12]  On October 30, 2011, respondent sent petitioner a letter stating that he would be contacted regarding his offer-in-compromise by January 28, 2012.  The letter informed him that he was required to make the proposed $87,900 monthly payments while respondent evaluated his offer-in-compromise.  The letter further stated that "[f]ailure to make the payments may result in returning your offer without further consideration."  Petitioner never made any of the proposed payments.

The case was assigned to Settlement Officer Joyce Pechera (Settlement Officer Pechera) on November 28, 2011.  On November 28 and December 19, 2011, respondent mailed letters to petitioner informing him that his request for a collection due process (CDP) hearing had been received and that Settlement Officer Pechera would be his point of contact.

On December 6, 2011, petitioner called Settlement Officer Pechera, who informed him that although a notice of levy had been served, the money would be "on hold" until she made a decision on the offer-in-compromise, unless collection became jeopardized.  That same day, Settlement Officer Pechera advised Mr. Kass that petitioner was required to make his proposed monthly payments and that if they were not made, she would return the offer-in-compromise.

[*13] Upon review of petitioner's offer-in-compromise, Settlement Officer Pechera noted that while petitioner provided a list of his bank accounts and balances, he did not include the underlying bank statements. On January 9, 2012, Settlement Officer Pechera sent to petitioner a letter entitled "Appeals Received Your Request for a Collection Due Process Hearing", in which she informed him that an in-person CDP hearing had been scheduled for February 9, 2012. She further informed petitioner that he needed to provide specific financial documents within 14 days of the issuance of the letter and that he needed to immediately begin paying the proposed monthly installments of $87,900.

At petitioner's request the deadline to submit the financial documents was extended to February 23, 2012, and the CDP hearing was rescheduled for March 8, 2012. Settlement Officer Pechera received additional documentation from petitioner and reviewed it on March 7, 2012. On the basis of a preliminary analysis of the documentation, Settlement Officer Pechera determined that petitioner had dissipated $4 million from the IB account, $27,752.71 from an Apple Bank account, and $27,000 of sales proceeds for a Ferrari.

The additional documentation, however, did not enable Settlement Officer Pechera to independently verify petitioner's financial situation for a number of reasons. First, the information petitioner provided was the same material that was

[*14] presented with the offer-in-compromise. Her notes state that "I'm unable to use this information as TP [i.e., petitioner] did not provide details on source of income and liabilities. TP created an excel sheet on a yearly basis which I have no way of verifying the information provided." Second, while petitioner submitted Internet printouts of his lending accounts, he did not provide information showing the total investments in the accounts. Third, petitioner failed to provide documentation to verify that he held $2 million in assets in three offshore bank accounts at Bank of Luxembourg, Credit Suisse, and Pictet Securities. Fourth, petitioner asserted that he held a 5% interest in an entity called "Polmero Trust" and that his uncle held the remaining 95%, but provided no documentation to substantiate the claim.[16] Finally, petitioner failed to provide documentation to establish the value of three real estate properties owned by 1916 Ocean Ave., LLC.

    b.    <u>CDP Hearing</u>

On March 8, 2012, Settlement Officer Pechera held the CDP hearing with petitioner and Mr. Kass. Settlement Officer Pechera explained that because of the amount at issue, acceptance of petitioner's offer-in-compromise would require

---

[16]This purported 95/5% ownership arrangement is in conflict with petitioner's testimony throughout trial of a purported 93/7% ownership arrangement with his uncle.

**[*15]** approval by IRS headquarters and the Department of Justice (DOJ). The entire approval process would take at least six months. Petitioner asked Settlement Officer Pechera to expedite the processing of his offer-in-compromise.

In discussing the offer-in-compromise, petitioner disclosed that most of his assets were held in the names of relatives, various LLCs, and trusts. Petitioner explained that Ang & Ang, LLC, was a holding company which owned numerous assets, including the offshore bank accounts, 95% of Ocean Ave., LLC, and the levied IB account, which petitioner stated was held in his mother's name. Petitioner also asserted that he held a 7% interest in Ang & Ang, LLC, with his uncle owning the balance. However, petitioner stated for purposes of the offer-in-compromise, he and his uncle agreed to consider the assets as 100% owned by petitioner.

With respect to his financial situation, petitioner explained that he had no income. Instead, he paid his $9,000 per month living expenses by taking funds from Ang & Ang, LLC. Specifically, he stated that the money came from the IB account as well as other investment accounts. Settlement Officer Pechera replied that if Ang & Ang, LLC, was a partnership, the money he received was a "distribution or a draw". Petitioner replied: "But it's all in one umbrella".

[*16] Petitioner failed to bring documentation to the CDP hearing to substantiate his ownership claims or his asset valuations. Settlement Officer Pechera granted petitioner additional time to provide the documentation she needed in order to properly evaluate petitioner's assets and his collection potential. The parties agreed to a due date of March 30, 2012. Settlement Officer Pechera told petitioner to call her for an extension if he could not make that deadline.

During this meeting the parties never discussed the nominee and jeopardy levy determination. Although Settlement Officer Pechera was aware of petitioner's request for administrative review of the jeopardy levy, petitioner's request was not acted upon.

    c.    <u>Settlement Officer Pechera's Rejection of Petitioner's Offer-in-Compromise</u>

Petitioner did not provide the requested documentation by the March 30, 2012, deadline, nor did he request additional time to do so.[17] As a result, Settlement Officer Pechera was unable to evaluate his collection potential and rejected his offer-in-compromise. On April 17, 2012, Settlement Officer Pechera closed the case.

---

[17]At trial Mr. Kass testified that petitioner did not order an appraisal for the real estate development at 1916 Ocean Avenue until December 2012.

[*17] On the basis of the Office of Chief Counsel memorandum, the CDP hearing, and her own investigation, Settlement Officer Pechera determined that the jeopardy levy was reasonable. Pursuant to her own investigation, Settlement Officer Pechera discovered that the building at 1916 Ocean Avenue had been listed for sale--a fact that petitioner had not disclosed during the CDP conference on March 8, 2011. After closing the case, Settlement Officer Pechera requested approval to sustain the jeopardy levy action, stating: "Review of the facts presented shows TP is placing his assets beyond the reach of the Government by transferring it to nominees and alter ego entities, thus jeopardy levy is warranted".

Settlement Officer Pechera issued a notice of determination on April 25, 2012. In the notice, Settlement Officer Pechera verified that notice and demand had been issued and that notice of petitioner's right to a CDP review had been timely issued pursuant to section 6330(f). However, Settlement Officer Pechera stated erroneously that petitioner's request for administrative review of the jeopardy levy, dated September 20, 2011, was untimely. With respect to petitioner's offer-in-compromise, Settlement Officer Pechera stated: "We are unable to properly evaluate your offer in compromise without the information we requested. Therefore your Offer in Compromise is rejected." With respect to the jeopardy levy, she stated: "The facts presented and information contained in your

**[*18]** administrative file met our criteria under which a jeopardy levy can be issued. Therefore, the issuance of the Notice of Jeopardy Levy was reasonable in your case."

5.  Ms. Ang's Bankruptcy Proceedings

While his offer-in-compromise was pending, petitioner sought to prevent collection on another front. On October 7, 2011, shortly after respondent had levied upon the IB account, petitioner's mother filed for bankruptcy protection under chapter 11 of the Bankruptcy Code to prevent the IRS from seizing the money in the account. At the end of July 2012, Ms. Ang's bankruptcy case was dismissed and Interactive Brokers released $1.9 million to the IRS. Immediately thereafter, and before the IRS could collect the funds, Ms. Ang again filed for bankruptcy relief, this time under chapter 13 of the Bankruptcy Code.

Although petitioner and his mother had separate attorneys representing them, petitioner made all the decisions in her bankruptcy proceedings. Moreover, petitioner's attorneys rather than Ms. Ang's attorneys dealt extensively with the Department of Justice in connection with Ms. Ang's bankruptcy case. Finally, both petitioner's and his mother's attorneys were paid from the same "whole family umbrella".

**[*19]**                              OPINION

This case involves a review of respondent's determination to proceed with the collection of petitioner's unpaid tax liabilities for 1998 through 2001.

I.    CDP Review of Jeopardy Levy

Collection is in jeopardy when at least one of the following conditions exists:  (1) "'The taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself or herself'"; (2) "'The taxpayer is or appears to be designing quickly to place his, or her, or its property beyond the reach of the Government either by removing it from the United States, by concealing it, by dissipating it, or by transferring it to other persons'"; or (3) "'The taxpayer's financial solvency is or appears to be imperiled.'"  Prince v. Commissioner, 133 T.C. 270, 276-277 (2009) (quoting section 1.6851-1(a)(1), Income Tax Regs.).

When the Commissioner determines that the collection of tax is in jeopardy, the taxpayer is not afforded a prior opportunity for a hearing pursuant to section 6330 to challenge the appropriateness of the levy before it is issued.  See sec. 6330(f)(1).  However, section 6330(f)(4) provides that the taxpayer against whom a jeopardy levy is issued shall be given the opportunity for the hearing described in section 6330 within a reasonable time after the levy.  Thus subsections (d) and (f) of section 6330 confer upon a taxpayer against whom a jeopardy levy has been

**[\*20]** issued an unqualified right to a postlevy hearing (if timely requested) and judicial review by this Court. Bussell v. Commissioner, 130 T.C. 222, 236-237 (2008). As part of the hearing, the Commissioner must verify "that the requirements of any applicable law or administrative procedure have been met." Sec. 6330(c)(1).[18]

If the Secretary makes a finding that the collection of tax is in jeopardy, notice and demand for immediate payment of the tax may be made. Sec. 6331(a). Pursuant to section 7429(a)(2), a taxpayer may seek administrative review of a jeopardy levy made under section 6331(a) within 30 days of receiving written notice of the levy. When such a request for review is timely made, the Secretary shall determine whether the jeopardy levy "is reasonable under the circumstances". Sec. 7429(a)(3). Reasonableness is something more than "'not arbitrary or capricious'" and something less than "'substantial evidence'." McWilliams v. Commissioner, 103 T.C. 416, 422 (1994) (quoting Davis v. United States, 511 F. Supp. 193, 197 (D. Kan. 1981)). The Commissioner bears the

---

[18]Because an Appeals officer must consider compliance with applicable law in a sec. 6330 determination regardless of whether it is raised by the person challenging the collection action at the Appeals hearing, this Court will review the Appeals officer's verification under sec. 6330(c)(1) without regard to whether the taxpayer raised it at the Appeals hearing. Hoyle v. Commissioner, 131 T.C. 197, 202-203 (2008).

**[\*21]** burden of proving that the levy was "reasonable under the circumstances". Sec. 7429(g).

In the notice of determination Settlement Officer Pechera erroneously determined that petitioner's request for administrative review of the jeopardy levy, dated September 20, 2011, was untimely. Petitioner, however, was not prejudiced thereby for several reasons discussed below. Furthermore, for these same reasons, we do not believe that a remand instructing respondent to conduct a review of the jeopardy levy pursuant to section 7429 would be productive.[19]

First, in requesting administrative review of a jeopardy levy, a taxpayer is required to submit evidence that the levy is unreasonable. Sec. 301.7429-2, Proced. & Admin. Regs. ("[A request for the review of a jeopardy levy under section 7429(a)(2)] shall be in writing, shall state fully the reasons for the request, and shall be supported by such evidence as will enable the district director to make the redetermination described in section 7429(a)(3)."). Petitioner's request for administrative review did not include any supporting evidence and contained only his summary denial that he was moving assets out of the Government's reach.

---

[19]In our discretion, we may remand a collection case to the Appeals Office for further administrative review. Marlow v. Commissioner, T.C. Memo. 2010-113, 99 T.C.M. (CCH) 1462, 1466-1467 (2010) (citing Hoyle v. Commissioner, 131 T.C. 197 (2008)). We decline to do so here.

[*22] Second, during his CDP hearing, petitioner could have, but did not,

challenge the appropriateness of the jeopardy levy. See sec. 6330(c)(2)(A)

(providing that during a CDP hearing, a taxpayer may raise any relevant issue with

regard to the collection activities, including challenges to the appropriateness of

collection actions). While petitioner argued in his CDP hearing request that the

jeopardy levy was inappropriate, during his CDP hearing, he abandoned the issue

and chose to focus exclusively on his offer-in-compromise.[20]

Third, as part of the CDP review, Settlement Officer Pechera independently

concluded that the jeopardy levy was reasonable. We review Settlement Officer

Pechera's determination for abuse of discretion.[21] See Sego v. Commissioner, 114

---

[20]On brief petitioner challenges the jeopardy levy on the basis that it would cause him economic hardship. See sec. 301.6343-1(b)(4), Proced. & Admin. Regs. Petitioner, however, did not raise the issue of economic hardship at his CDP hearing nor as a basis for his offer-in-compromise. Therefore, petitioner may not raise this issue for the first time before this Court. See Giamelli v. Commissioner, 129 T.C. 107, 115 (2007).

[21]Respondent argues sec. 7429(b)(2)(A) precludes this Court from reviewing the reasonableness of a jeopardy levy. We disagree. Sec. 7429(b)(2)(A) provides that, as a general matter, the District Courts of the United States have exclusive jurisdiction over any civil action brought under sec. 7429(b). In this case, we derive our jurisdiction to review respondent's actions, including the reasonableness of the jeopardy levy, under sec. 6330(d). See Bussell v. Commissioner, 130 T.C. 222, 236-237 (2008) (holding that sec. 6330(d) confers upon a taxpayer an unqualified right to a postlevy hearing and judicial review by this Court of, inter alia, whether the Commissioner improperly levied upon the

(continued...)

**[\*23]** T.C. 604, 610 (2000). An abuse of discretion is defined as any action that is unreasonable, arbitrary or capricious, clearly unlawful, or lacking in sound basis in fact or law. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979); Woodral v. Commissioner, 112 T.C. 19, 23 (1999); see also Dalton v. Commissioner, 682 F.3d 149, 156 (1st Cir. 2012) (holding that a reviewing court considers "whether the factual and legal conclusions reached at a CDP hearing are reasonable, not whether they are correct"), rev'g 135 T.C. 393 (2010) and T.C. Memo. 2011-136.

On the basis of the administrative record, we hold that Settlement Officer Pechera did not abuse her discretion in concluding that the jeopardy levy was reasonable. Settlement Officer Pechera based her determination on the results of a detailed and comprehensive investigation by the Office of Chief Counsel, her own investigation, and the CDP hearing. First, on the basis of a preliminary analysis of the financial documentation that petitioner provided with his offer-in-compromise, Settlement Officer Pechera determined that petitioner had dissipated $4 million from the IB account, $27,752.71 from an Apple Bank account, and $27,000 of sale proceeds from a Ferrari. Second, after conducting the CDP hearing and reviewing

_____

21(...continued)
taxpayer's assets.); Dorn v. Commissioner, 119 T.C. 356, 359 (2002).

[*24] the Office of Chief Counsel memorandum, Settlement Officer Pechera determined that petitioner was concealing assets from the Government by placing assets in his relatives' names and in various LLCs and trusts. In addition, pursuant to her own investigation, Settlement Officer Pechera discovered that the building at 1916 Ocean Avenue had been listed for sale--a fact that petitioner had not disclosed. On the basis of these facts, we conclude that Settlement Officer Pechera did not abuse her discretion in concluding that the jeopardy levy was reasonable under the circumstances. See Drake v. Commissioner, 511 F.3d 65, 70 (1st Cir. 2007) (holding that jeopardy levy was reasonable where the taxpayer transferred sale proceeds to his sons and those proceeds were thereafter held in brokerage accounts in the sons' names), aff'g T.C. Memo. 2006-151 and 125 T.C. 201 (2005); Bibby v. Commissioner, T.C. Memo. 2013-281, at *8 (holding that jeopardy levy was reasonable where the taxpayer was dissipating funds and transferring funds to third parties).

At trial petitioner vigorously denied that he was concealing assets from the Government or that any risk existed of assets' being transferred or dissipated. However, the evidence petitioner introduced at trial buttresses, rather than refutes, respondent's jeopardy levy determination.

[*25] First, petitioner testified that he has resided in the United States for over 20 years. Yet petitioner admits that while he has made over $20 million by trading securities, he has no assets in his name within the United States. Instead, all of the assets in the "whole family umbrella" are held in the name of his mother or his uncle, neither of whom speaks English and neither of whom lives in the United States. Petitioner has not provided a satisfactory explanation for why all his U.S.-based assets are held in his relatives' names. This fact is probative evidence that petitioner engaged in a scheme to conceal his assets from the IRS.

Second, petitioner attempted to avoid taxation of the approximately $20 million that he earned trading securities by claiming a purported 93/7 profit-sharing agreement with his uncle, a foreign national who is exempt from U.S. taxation. On the same basis, petitioner seeks to avoid collection of his unpaid tax liabilities by claiming ownership of merely 7% of various assets in the "whole family umbrella". According to petitioner, this purported arrangement was consideration for his uncle's forgiveness of an $11,000 debt. However, the purported 93/7 profit-sharing agreement is wholly devoid of rational economic basis. A transfer's economic reality prevails over its form, and a finding of economic reality turns on whether the transfer would have followed the same form had it been between the transferee and an independent lender. Estate of Rosen v.

[*26] Commissioner, T.C. Memo. 2006-115, 91 T.C.M. (CCH) 1220, 1236 (2006). Transfers between related parties are examined with special scrutiny. Id. Courts may disregard a transaction that as a whole does not have a rational economic basis compelled by business realities, separate and apart from the resulting tax benefits. Buyuk LLC v. Commissioner, T.C. Memo. 2013-253, at *73 (citing Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978)). Petitioner's purported profit-sharing agreement with his uncle is inconsistent with economic and business realities. We are convinced that no economically rational actor dealing at arm's length would assign 93% of his substantial trading profits to another person, without any termination conditions, in exchange for the forgiveness of an $11,000 debt. We are equally convinced that no economically rational actor, unmotivated by tax considerations, would have stayed in such an arrangement as his profits soared to approximately $20 million. Accordingly, we conclude that the purported profit-sharing agreement was devised as part of a plan by petitioner to avoid paying income tax to the IRS and to impede the IRS' collection efforts.

Third, petitioner claimed that his mother owned $1 million in the IB account. However, although petitioner claimed that he gave his mother $500,000 in 2004 and $500,000 in 2005, he did not file gift tax returns disclosing such gifts

[*27] until 2010, after his tax troubles had begun.  Furthermore, petitioner

admitted that he chose the $1 million amount because his research led him to

conclude that any gift up to $1 million would be exempt from gift tax.  Finally,

petitioner admitted that he does not remember where the money came from, other

than that it was from the "whole family umbrella".  In the light of these facts, we

are convinced that this so-called gift is no more than a story concocted by

petitioner to delay respondent's collection efforts.[22]

Fourth, petitioner admitted that the purpose of his mother's two bankruptcy

filings was to stall respondent's collection efforts.  Gabrielle Hirz, the DOJ

attorney assigned to Ms. Ang's bankruptcy cases, testified credibly that petitioner,

not his mother, made the decisions in the bankruptcy proceedings.  In other words,

---

[22]We note that petitioner did not argue at his CDP hearing that the IB
account was wrongfully levied upon because of Ms. Ang's ownership.  We further
note that even if some of the funds in the IB account did belong to Ms. Ang,
petitioner does not have standing to assert her claim of ownership.  This Court
considers the doctrine of standing to be "'inherently applicable to our
proceedings.'"  Prince v. Commissioner, 133 T.C. 270, 274 (2009) (quoting
Anthony v. Commissioner, 66 T.C. 367, 373 (1976), aff'd, 566 F.2d 1168 (3d Cir.
1977)) ("Petitioner does not have standing in this proceeding to seek the return of
money or property that does not belong to him.").  Under this doctrine, a plaintiff
generally must assert his own legal rights and interests and cannot rest his claim to
relief on the legal rights of third parties.  Id.  Moreover, sec. 7426(a)(1) provides
that a person, other than the taxpayer, who is subject to a wrongful levy may bring
an action in a District Court.  No such action was ever brought by Ms. Ang.

**[\*28]** petitioner abused the protections offered by the U.S. bankruptcy system to delay respondent's collection efforts.

Finally, petitioner exercised full control over the IB account and could transfer money from the account without restriction.  At trial petitioner admitted his mother neither manages nor has access to the IB account and that he has full control over it.  In addition, petitioner admitted that he withdrew $5 million from the IB account to pay the mortgage for the 1916 Ocean Avenue building, a property in which Ms. Ang has no ownership interest and which he valued at merely $3.272 million in his offer-in-compromise.  Finally, Brian Hanley of IBG, LLC, the parent company of IB, credibly testified that as an enrollee of IB's secured transaction processing program, petitioner could transfer unlimited amounts from his IB account at any time.

For these reasons, the evidence petitioner introduced at trial bolsters respondent's jeopardy levy determination.

II.   Offer-in-Compromise

Petitioner also asserts that Settlement Officer Pechera improperly rejected his offer-in-compromise.  Where the validity of the underlying liabilities is not

**[\*29]** properly at issue,[23] we review the determination of the settlement officer for abuse of discretion.  Sego v. Commissioner, 114 T.C. at 610; Goza v. Commissioner, 114 T.C. 176, 182 (2000).

At the CDP hearing, the taxpayer may raise any relevant issue with regard to the collection activities, including alternative means of collection such as an offer-in-compromise.  Sec. 6330(c)(2)(A); see also Sego v. Commissioner, 114 T.C. at 609.  Taxpayers are expected to provide all relevant information requested by the settlement officer, including financial statements, for his consideration of the facts and issues involved in the hearing.  Sec. 301.6330-1(e)(1), Proced. & Admin. Regs.

Section 7122(a) authorizes the Secretary to compromise a taxpayer's income tax liability.  In general, the decision to accept or reject an offer as well as the terms and conditions agreed to are left to the discretion of the Commissioner.

---

[23]A taxpayer is precluded from contesting the existence or amount of the underlying tax liability at the CDP hearing unless the taxpayer did not receive a statutory notice of deficiency or did not otherwise have an opportunity to dispute the underlying tax liability.  Sec. 6330(c)(2)(B).  Petitioner received a notice of deficiency, filed a petition in this Court, and settled his case.  Consequently, his tax liabilities are not properly at issue in this matter.  See Deutsch v. Commissioner, 478 F.3d 450, 451-452 (2d Cir. 2007) (holding that a taxpayer was precluded from later challenging his underlying tax liability where his attorney consented to the tax assessment, thereby waiving his right to contest liability), aff'g T.C. Memo. 2006-27.

**[\*30]** Sec. 301.7122-1(a)(1), (c)(1), Proced. & Admin. Regs. The grounds for the compromise of a tax liability are doubt as to liability, doubt as to collectibility, and the promotion of effective tax administration. Sec. 301.7122-1(b), Proced. & Admin. Regs. Petitioner based his offer-in-compromise on doubt as to collectibility, which "exists in any case where the taxpayer's assets and income are less than the full amount of the liability." Sec. 301.7122-1(b)(2), Proced. & Admin. Regs.

The Commissioner will generally compromise a liability on the basis of doubt as to collectibility only if the liability exceeds the taxpayer's reasonable collection potential, "i.e., that amount, less than the full liability, that the IRS could collect through means such as administrative and judicial collection remedies". Murphy v. Commissioner, 125 T.C. 301, 309 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006); Salazar v. Commissioner, T.C. Memo. 2008-38, 95 T.C.M. (CCH) 1149, 1154 (2008), aff'd, 338 Fed. Appx. 75 (2d Cir. 2009).

Petitioner argues that Settlement Officer Pechera abused her discretion when she "suddenly and arbitrarily closed the case" and that she did not conduct a valid and legitimate study of his reasonable collection potential. We disagree.

Petitioner based his offer-in-compromise on his own calculation of his reasonable collection potential, and he submitted some documents regarding his

[*31] assets. In order for a settlement officer to calculate a taxpayer's reasonable collection potential, the taxpayer must provide all relevant financial information. See sec. 301.6330-1(e)(1), Proced. & Admin. Regs. It is well settled that a settlement officer properly exercises her discretion in rejecting a collection alternative such as an offer-in-compromise on the ground that the taxpayer failed to provide all financial information necessary to fully evaluate the taxpayer's ability to pay. Ramdas v. Commissioner, T.C. Memo. 2013-104, at *24; see Orum v. Commissioner, 123 T.C. 1, 13 (2004), aff'd, 412 F.3d 819 (7th Cir. 2005); Kansky v. Commissioner, T.C. Memo. 2007-40, 93 T.C.M. (CCH) 921, 925 (2007).

Settlement Officer Pechera requested that petitioner provide financial documentation to verify his reasonable collection potential calculation. Although she originally gave him 14 days to comply, at his request she extended the deadline by a month. When she received petitioner's submission, Settlement Officer Pechera noted that it consisted of the same documents previously submitted with his offer-in-compromise and thus did not verify his claims. At the CDP hearing, Settlement Officer Pechera instructed petitioner to provide her with the requested documentation by March 30, 2012, to allow her to verify his reasonable collection potential calculation. When the deadline came and went,

[*32] Settlement Officer Pechera determined that she was unable to properly evaluate petitioner's offer-in-compromise. Consequently, she rejected it. Petitioner admits that he did not timely provide the requested documentation nor request an extension of time. While setting unreasonable deadlines can constitute an abuse of discretion, see Shanley v. Commissioner, T.C. Memo. 2009-17, 97 T.C.M. (CCH) 1062, 1065 (2009) (stating that an Appeals officer's unreasonable denial of a request for more time to submit that evidence would be an abuse of discretion), Settlement Officer Pechera extended deadlines on multiple occasions and even offered another extension upon request. We therefore find that Settlement Officer Pechera did not abuse her discretion in rejecting petitioner's offer-in-compromise.

At trial petitioner admitted that he did not disclose a number of bank accounts in his offer-in-compromise but claims that those accounts were "irrelevant" because they each contained less than $10,000. Where an offer-in-compromise is based on a taxpayer's ability to pay, a taxpayer may not pick and choose which assets to disclose to the Commissioner. See sec. 301.6330-1(e)(1), Proced. & Admin. Regs. ("Taxpayers will be expected to provide all relevant information requested by Appeals, including financial statements, for its consideration of the facts and issues involved in the hearing." (Emphasis added.)).

[*33] Moreover, in relation to the $1,411 cash from bank accounts that petitioner did disclose, these accounts were highly relevant. Settlement Officer Pechera would have been within her discretion to reject petitioner's offer-in-compromise on this basis alone.

Furthermore, petitioner never made any of the monthly $87,900 payments he proposed as part of his offer-in-compromise. Therefore, Settlement Officer Pechera would have been within her discretion to reject petitioner's offer-in-compromise on this basis as well. See sec. 7122(c)(1)(B), (d)(3)(C); cf. Nasir v. Commissioner, T.C. Memo. 2011-283, 102 T.C.M. (CCH) 558, 563 (2011) (holding that a taxpayer's failure to make proposed payments enabled the IRS to treat his offer-in-compromise as withdrawn).

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered for

respondent.